**AMERICAN FEDERAL BANK, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–498–C.

United States Court of Federal Claims.

Nov. 7, 2003.

Kwame A. Clement, Washington, D.C., for plaintiff. With him on the briefs were Howard N. Cayne, David B. Bergman, and Michael A. Johnson.

Jonathan S. Lawlor, Trial Attorney, Commercial Litigation Branch, Department of Justice, for defendant, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director,

Jeanne E. Davidson, Deputy Director, Gregory R. Firehock, and Joanne E. Johnson.

### OPINION AND ORDER

LETTOW, Judge.

Before the Court are cross-motions for partial summary judgment on liability in this *Winstar*-related case.[1] Both plaintiff's and defendant's motions are denied because genuine issues of material fact exist with regard to intent to contract, and a trial must be held to resolve those factual issues.

### BACKGROUND

*A. Regulatory and Procedural Setting*

This case is one of many arising from the government's efforts to address problems that arose with thrift banking institutions during the 1980s and early 1990s. A detailed account of the situation in that banking sector during this time and at and after the enactment in 1989 of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464), is provided in *Winstar III*.

In short, high interest rates and inflation in the late 1970s and early 1980s caused thrifts to lose money on a continuing basis because the cost of deposits exceeded revenues from longstanding, fixed-rate, low-interest mortgages. *Winstar III*, 518 U.S. at 845, 116 S.Ct. 2432. The pertinent regulatory agencies, the Federal Home Loan Bank Board ("FHLBB" or "Bank Board"), which chartered and regulated thrifts, and the Federal Savings and Loan Insurance Corporation ("FSLIC" or "Corporation"), which insured the deposits held by thrifts, responded by encouraging financially stronger banking institutions to merge with or take over weak thrifts, sometimes with cash infusions from FSLIC, and typically with assistance other than cash from the Bank Board. *Id.* at 846–51, 116 S.Ct. 2432.

The chief means by which the Bank Board assisted and promoted such mergers was by way of regulatory accounting of "supervisory goodwill." The Bank Board allowed the use of the purchase method of accounting for a "supervisory merger," recognizing as goodwill the excess of the fair market value of the liabilities assumed over the fair market value of the assets acquired. This goodwill would be deemed regulatory capital. *Id.* at 850–51, 116 S.Ct. 2432. Otherwise the Bank Board would have treated goodwill of this type as an intangible asset that would not count toward the merged bank's regulatory capital.[2] The Bank Board allowed amortization of the supervisory goodwill over a period of years that frequently exceeded the life of the underlying asset—typically comprised of the pool of mortgages held by the acquired thrift. *Id.* at 851–53, 116 S.Ct. 2432. "[This] treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)." *Id.* at 851, 116 S.Ct. 2432.

These measures by the Bank Board and FSLIC encouraged banking entities to take over failing thrifts but did not require FSLIC to expend cash. The hope and expectation of the Bank Board and FSLIC was that the regulatory treatment of supervisory goodwill as a capital asset would provide a bridge over the time it took for inflation to abate and for a better balance to be achieved between costs of deposits and revenues from long-term loans. *Id.* at 845–48, 116 S.Ct.

---

1. *See Winstar Corp. v. United States*, 25 Cl.Ct. 541 (1992) ("*Winstar I*"), aff'd, 64 F.3d 1531 (Fed. Cir.1995) (en banc) ("*Winstar II*"), aff'd, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").

2. In 1981 and 1982, Generally Accepted Accounting Principles ("GAAP") allowed two methods of accounting for mergers and acquisitions, either "purchase of assets" or "pooling of interest." Under the pooling method, the previously "separate businesses are combined, and future operating results are based on the original amounts of the respective assets and liabilities." *First Fed. Lincoln Bank v. United States*, 54 Fed. Cl. 446, 448 n. 4 (2002). The purchase method leaves unchanged the accounting of the purchasing entity but "revalues the assets and liabilities of the acquired entity from their original book value to their market value at the time of the acquisition." *Id.*

2432.[3] Continuing financial difficulties led to the enactment of FIRREA on August 9, 1989, which, among other things, required financial institutions to maintain minimum regulatory-capital requirements without regard to such intangibles as supervisory goodwill. *See* 12 U.S.C. § 1464(t). Disallowance of such regulatory capital caused numerous banks that had merged with failed thrifts to bring claims in this Court primarily founded on breach of contract by the government.

This case was brought by plaintiff American Federal Bank, FSB ("American Federal") in 1995, and it had been stayed while representative lead cases proceeded through litigation. The parties filed cross-motions for partial summary judgment on liability in 2000, and, after supplemental briefing and a hearing, both in September 2003, the motions have become ready for disposition.

### B. The Merger Transactions At Issue

American Federal was a federally chartered savings bank based in Greenville, South Carolina. Within a thirty-seven day period in the Spring of 1982, American Federal gained approval to acquire four smaller thrifts that were in financial difficulty: (1) United Federal Savings & Loan Association of Fountain Inn, South Carolina ("United"); (2) Home Savings & Loan Association of Easley, South Carolina ("Home"); (3) Bell Federal Savings & Loan Association of Inman, South Carolina ("Bell"); and (4) Family Federal Savings & Loan Association of Greer, South Carolina ("Family"). Prior to these acquisitions, United and Home each had a very small positive net regulatory capital, less than one-tenth of the regulatory

requirement,[4] but each showed a negative net worth when their assets were marked to market value.[5] Bell and Family were insolvent at the time of the merger, even before a mark-to-market. J.A. Tab 12 at 0434; Tab 16 at 0540. The parties dispute whether officials of the Federal Home Loan Bank of Atlanta ("FHLB–Atlanta") proposed that American Federal acquire the four failing thrifts or encouraged American Federal to do so.

On September 4, 1981, FHLB–Atlanta sent American Federal a copy of Bank Board Memorandum R–31b, which had been issued three days earlier by FHLBB. J.A. Tab 1. Memorandum R–31b stated, in pertinent part:

> This memorandum sets forth guidelines for the staff of the Federal Home Loan Bank Board in reviewing the proposed accounting, under generally accepted accounting principles, for goodwill arising in the acquisition of a savings and loan association. This intangible asset generally results when the purchase price for an institution exceeds the fair value of the assets acquired, reduced by the fair value of any liabilities assumed. It only arises when the accounting for a business combination is in accordance with the purchase method.

*Id.* Just over one month after receiving this memorandum, American Federal submitted its first merger application to the Bank Board. J.A. Tab 2 at 0004–6 (United application dated October 8, 1981). That application was followed shortly thereafter by three others. J.A. Tab 6 at 0161 (Home application

---

**3.** In addition, where the amortization period for supervisory goodwill was longer than the anticipated average life of underlying loans (*e.g.*, a 40-year amortization period compared to a 20-year average life), the acquiring thrift would be able to recapture the mark-to-market discount on the acquired loans faster than it would amortize the goodwill. Thus, it would show a "gain" in the earlier years following a supervisory merger. *See Winstar III*, 518 U.S. at 853 & n. 8, 116 S.Ct. 2432. This discrepancy was curtailed in 1983 by the promulgation of Statement of Financial Accounting Standards No. 72 ("SFAS 72") by the Financial Accounting Standards Board. *Id.* at 855, 116 S.Ct. 2432. SFAS 72 "applied specifically to the acquisition of a savings and loan association," and it "eliminated any doubt that the differential amortization periods on which

acquiring thrifts relied to produce paper profits in supervisory mergers were inconsistent with GAAP." *Id.* Previously, "the proper amortization period for goodwill under GAAP was uncertain." *Id.* at 855 n. 10, 116 S.Ct. 2432.

**4.** On a regulatory book-value basis, United's net worth was $184,000, J.A. Tab 4 at AF31 00252, and Home's was $527,000. J.A. Tab 8 at AF31 00893.

**5.** United's projected unrealized loss on its loans on a mark-to-market basis was $9,571,000. J.A. Tab 2 at 0076. Home's unrealized loss on its loans was $30,682,642. J.A. Tab 8 at AF31 00899.

432

dated Nov. 2, 1981); Tab 10 at AF31 00955 (Family application dated March 3, 1982); Tab 14 at 0445 (Bell application dated March 23, 1982). The set of acquisitions was among the first to be approved and consummated under the "supervisory goodwill" regime contemplated by Bank Board Memorandum R–31b.

The documentation for the acquisitions was not extensive. All four transactions were "unassisted," i.e., the government did not provide a cash payment to support the acquisitions, so the parties did not enter into a supervisory action agreement. American Federal entered into merger agreements with each of the four thrifts, and those agreements were conditioned on the approval of the Bank Board, through action either of the Bank Board itself or of its delegatee, the Principal Supervisory Agent ("PSA") for the FHLB–Atlanta. J.A. Tab 2 at 0066; Tab 6 at 0213; Tab 10 at AF31 00961; Tab 14 at 0456. The merger agreements were included as part of American Federal's merger applications for each thrift. All four applications explicitly stated that the proposed mergers would be subject to accounting using the purchase method in accordance with Memorandum R–31b. J.A. Tab 2 at 0073; Tab 6 at 0221; Tab 10 at AF31 00959, AF31 00986–88; Tab 14 at 0448. The United and Home

applications included calculation tables showing the amount of supervisory goodwill to be generated by the mergers and the amortization of that goodwill over a forty-year period. J.A. Tab 2 at 0077; Tab 6 at 0223. The Family and Bell applications expressly requested that goodwill be amortized over a forty-year period. J.A. Tab 10 at AF31 01000; Tab 14 at 0483.

On April 1, 1982, the Bank Board issued Resolution No. 82–226 conditionally approving the United merger and Resolution No. 82–227 conditionally approving the Home merger. J.A. Tab 3; Tab 7. Both resolutions contained identical conditions. The PSA of FHLB–Atlanta issued a letter conditionally approving the Bell merger on April 23, 1982, and a letter conditionally approving the Family merger on May 7, 1982. J.A. Tab 11; Tab 15. In each of the four mergers, approval was conditioned on the submission of analyses and an independent accountant's opinion describing the amount of goodwill arising from the merger and substantiating the reasonableness of that amount and its amortization period.[6] The Bank Board's approvals of the mergers with United and Home also contained a condition that in effect arguably approved the inclusion of supervisory goodwill as regulatory capital.[7]

---

**6.** *E.g.,* Condition 2 in Bank Board Resolution No. 82–226 regarding the United merger provided:

> That American Federal Savings and Loan Association shall furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision which (a) specifically describe, as of the Effective Date of the merger, any intangible assets including goodwill, or discount of assets arising from the merger to be recorded on American FS & LA's books, and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related periods and methods.

J.A. Tab 3 at 0142–43.

**7.** *E.g.,* Condition 4 in Bank Board Resolution No. 82–226 regarding the United merger provided:

> That, upon consummation of the merger, the resulting association shall compute its net worth requirement pursuant to Insurance Regulation Section 563.13, in a manner consistent with Bank Board Memorandum T 42–3, dated October 29, 1981.

J.A. Tab 3 at 0143. In *Winstar III*, the Supreme Court addressed 12 C.F.R. § 563.13 as it stood in 1981, the time pertinent to this case, because that same time period was relevant to the Glendale transaction at issue in *Winstar.* 518 U.S. at 854, 116 S.Ct. 2432. Regarding this regulation, the plurality opinion in *Winstar III* commented that:

> the relevant thrift regulations did not explicitly state that intangible goodwill assets created by that method could be counted toward regulatory capital. See 12 CFR § 563.13(a)(3) (1981) (permitting thrifts to count as reserves any "items listed in the definition of net worth"); § 563.13(a) (defining "net worth" as "the sum of all reserve accounts ..., retained earnings, permanent stock, mutual capital certificates ..., and any other nonwithdrawable accounts of an insured institution").[9]
>
> 9 The 1981 regulations quoted above were in effect at the time of the Glendale transaction. The 1984 regulations relevant to the Winstar transaction were identical in all material respects, and although substantial changes had been introduced into § 563.13 by the time of the Statesman merger in 1988, they do not appear to resolve the basic ambi-

American Federal addressed the conditions to the transactions by submitting analyses and letters from its accountant confirming the use of the purchase method of accounting and generation of supervisory goodwill with forty-year amortization. J.A. Tabs 4, 5 (United); Tab 8 (Home); Tabs 12, 13 (Family); Tabs 16, 17 (Bell). The record before the Court appears to contain some but not all of the confirmations by the PSA accepting these analyses and letters. *See* J.A. Tab 9 (Home).

Inferences can be drawn both ways from these undisputed facts regarding intent to form a contract—or not. The terms are specific, but American Federal's merger applications can be viewed either as contractual offers coupled with regulatory applications or as purely regulatory applications. Correspondingly, the government's conditional approvals may be construed as acceptances or conditional acceptances of a contract along with regulatory approvals or only as regulatory approvals. The context for the acquisitions and the interplay between American Federal and its merger partners on the one hand and the Bank Board on the other hand thus become particularly important in determining whether contracts regarding goodwill and its amortization were formed.

In this regard, there is no dispute between the parties that the acquisitions would not have been possible but for creation of supervisory goodwill and amortization of that goodwill over time. The supervisory goodwill generated was $11,806,361 for the United merger, $29,338,167 for the Home merger, $17,277,228 for the Bell merger, and $6,063,064 for the Family merger. J.A. Tab 4 at AF31 00257–8 (United); Tab 8 at AF31 00898–99 (Home); Tab 12 at 0439 (Family); Tab 16 at 0546 (Bell). Prior to the mergers, American Federal showed a regulatory net worth of $16,248,000. J.A. Tab 2 at 0079. Following the series of four acquisitions over the thirty-seven day period between April 1, 1982 and May 7, 1982, the surviving institution had "added" $64,484,819 of supervisory goodwill to its regulatory capital, and thus it

would have been insolvent absent the supervisory goodwill.

There is also no dispute over the fate of the resulting financial institution. American Federal continued in operation throughout the 1980s, amortizing supervisory goodwill in accord with the forty-year schedule provided in connection with the merger approvals. Compl. ¶ 24. In 1989, American Federal converted from mutual to stock ownership, and, in connection with that conversion, the Bank Board sought and obtained a reduction in the amortization period for goodwill from forty to approximately twenty-five years. *Id.* ¶¶ 26–29. The conversion occurred prior to FIRREA, and the enactment of that statute elided goodwill from capital.

In 1997, subsequent to the filing of the Complaint in this case, American Federal was acquired as a subsidiary of CCB Financial Corporation. *See* Motion of American Federal for Partial Summary Judgment On Liability at 1 n. 1. Thereafter, American Federal was merged into CCB Financial Corporation's subsidiary, Central Carolina Bank and Trust Company, and American Federal ceased to have a separate corporate existence. *Id.* In July 2000, CCB Financial Corporation merged with National Commerce Bancorporation. *Id.*

## DISCUSSION

### A. Standard For Decision

Summary judgment is appropriate if there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that would affect the outcome of the case. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. The movant bears the initial burden of establishing an absence of genuine issues of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317,

guity as to whether goodwill could qualify as regulatory capital. See 12 CFR § 563.13 (1988). Section 563.13 has since been superseded by [FIRREA].

*Id.* at 854 & n. 9, 116 S.Ct. 2432.

323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant then has the burden of producing sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505. It is not necessary that such evidence be admissible at trial, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative is not sufficient to withstand summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed. Cir.1987).

Although the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action,'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548, trial courts should act with caution in granting summary judgment and may deny it if there is reason to believe that a full trial is warranted. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. Caution is imperative because "[t]hough speedy and inexpensive, summary judgment is nonetheless a 'lethal weapon' capable of 'overkill.'" *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985) (citations omitted). *See also D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146–47 (Fed.Cir.1983) ("an improvident grant [of summary judgment] may deny a party a chance to prove a worthy case and an improvident denial may force on a party and the court an unnecessary trial").

A court does not "weigh" each side's evidence when considering a motion for summary judgment, *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir.2002), but rather "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8

L.Ed.2d 176 (1962)). "In particular, [in the *Winstar* context] any dispute regarding additional communications between plaintiff and the Government necessarily requires credibility determinations and the weighing of evidence and is especially inappropriate for resolution on summary judgment." *Fifth Third Bank of W. Ohio v. United States*, 52 Fed.Cl. 264, 269 (2002) (*"Fifth Third I "*) (citing *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505; *Jay v. Sec'y of DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993)). On cross-motions for summary judgment, courts must evaluate each motion on its own merits and resolve any reasonable inferences against the party whose motion is being considered. *Mingus*, 812 F.2d at 1391. A court should deny both motions if genuine disputes exist over material facts. *Id.*

## B. Contract Formation

In considering a motion for summary judgment, a court "must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. For a *Winstar*-related claim, courts apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar III*, 518 U.S. at 871, 116 S.Ct. 2432. "To form an agreement binding upon the government, four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed.Cir.2003). These requirements apply equally to both express and implied-in-fact contracts. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir. 1997).

"Whether a contract exists is a mixed question of law and fact." *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001) (*"CalFed II"*) (citations omitted). As the Court has observed, "[c]ontracts are not technical documents requiring certain forms. Rather, they are legal relationships imposed by the law on parties when certain functional prerequisites like intent, offer, acceptance, and consideration occur in

logical sequence." *Cal. Fed. Bank, FSB v. United States,* 39 Fed.Cl. 753, 773 (1997) ("*CalFed I*"), aff'd, 245 F.3d 1342 (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002). Thus, " '[r]egulatory' documents can be construed as contractual commitments where the reality of the transaction supports such a construction. However, the burden of proving that the reality of the transaction favors construing such documents as contractual undertakings, as opposed to regulatory statements, remains with plaintiff." *Fifth Third I,* 52 Fed.Cl. at 274–5. "Whether a contract exists in this case ... depends on all the facts and circumstances surrounding the acquisition[s] ... and, most importantly, the role of the government in that transaction." *Advance Bank, FSB v. United States,* 52 Fed.Cl. 286, 288 (2002).

### 1. Authority to contract.

■ Preliminarily, for two of the four mergers, Bell and Family, the government argues that the Principal Supervisory Agent of FHLB–Atlanta did not possess authority to bind the government in contract pursuant to his approval of the Bell and Family mergers. To prove that the government is contractually bound, American Federal must establish that the PSA had actual authority to bind the government. *Commercial Fed. Corp. v. United States,* 55 Fed.Cl. 595, 616 (2003). This authority can be either express or implied in fact. *Id.* " 'Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms.' " *Id.* (quoting *First Fed. Lincoln Bank v. United States,* 54 Fed.Cl. 446, 452 (2002)). "Actual authority may be implied when such authority is 'an integral part of the duties assigned to a [g]overnment employee.' " *Commercial Fed. Corp.,* 55 Fed.Cl. at 616 (quoting *Roy v. United States,* 38 Fed.Cl. 184, 189 (1997)).

Issue preclusion does not bar the government from litigating this question. American Federal argues that "preclusive effect" should be given to then-Chief Judge Smith's disposition of Common Issue Number 10 in *CalFed I. See* Pl.'s Resp. to Def.'s Supp. Mem. Regarding Liability at 23. In *CalFed I,* Common Issue No. 10 was stated as follows:

> Where a capital contract was made between a thrift acquiror and a FHLBB Principal Supervisory Agent ("PSA") located at a regional Federal Home Loan Bank rather than with a Bank Board official geographically located at the Federal Home Loan Bank Board in Washington, no contract can exist *per se* because no Principal Supervisory Agent had authority to make such a contract with a thrift acquiror.

39 Fed.Cl. at 776. Then–Chief Judge Smith ruled that PSAs did have authority to bind the government to contracts regarding amortization of goodwill. *Id.* at 776–77. However, the decision on this issue was not raised on appeal to the Federal Circuit, *see Fifth Third Bank of W. Ohio v. United States,* 52 Fed.Cl. 637, 640 (2002) ("*Fifth Third II*"), and thus it cannot constitute the basis for a claim of issue preclusion. *See Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1168–73 (5th Cir.1981) (application of non-mutual offensive collateral estoppel is disfavored regarding an unappealed alternative ground for decision); *Restatement (Second) of Judgments* § 27, cmts. i, o (1982). *See also Winters v. Diamond Shamrock Chem. Corp.,* 149 F.3d 387, 392–96 (5th Cir.1998) (disallowing offensive use of collateral estoppel regarding jurisdictional ruling by trial court that could not have been appealed), *cert. denied,* 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999). *Compare United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (rejecting application of non-mutual offensive collateral estoppel against the government), *with United States v. Stauffer Chem. Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984) (affirming use of mutual defensive collateral estoppel against the government).

■ On the merits of this issue, first, the government relies on 12 C.F.R. § 546.2(h)(8) (1982) (repealed), which prohibited PSAs from approving a merger that involved any agreement with FSLIC. This limitation on PSAs' authority expressly related only to agreements to which FSLIC was a party,

*i.e.*, assisted transactions in which FSLIC contributed capital to facilitate the merger. *Fifth Third II*, 52 Fed.Cl. at 642; *First Fed. Lincoln*, 54 Fed.Cl. at 452. The transactions involved in this case were unassisted, and thus they are not affected by this provision. The question of authority in this case is whether the PSA had authority to bind the Bank Board, not FSLIC.

In February 1982, FHLBB expanded its delegation of authority to allow PSAs "to approve merger applications in which goodwill is included in assets" and to "agree to certain forbearances in approving supervisory mergers which are currently granted by the Board." 47 Fed.Reg. 8152 (Feb. 25, 1982). This regulatory change was made several months before the PSA approved American Federal's acquisitions of Bell and Family. In addition, in June 1982, "because of some confusion which resulted from the earlier expansion of merger approval authority with respect to supervisory forbearance, the Board ratifie[d] all mergers which ha[d] been previously approved under delegated authority." 47 Fed.Reg. 26,807 (June 22, 1982) (internal citation omitted).

Second, the government focuses on language in 12 C.F.R. § 546.2(h) (1981) (repealed) that called for referral by the PSA of certain decisions: "[i]t is expected that when a merger subject to this delegation raises significant issues of law or policy for which the Corporation has not established a formal position, the [PSA] will refer that merger application to the Corporation for its consideration." As the Court noted in *Fifth Third II*, however, "FHLBB had detailed a formal position regarding the use of supervisory goodwill in memoranda R–31b and SP–24." 52 Fed.Cl. at 643 (citing *Winstar II*, 64 F.3d at 1541). Thus, the Bell and Family applications at issue here raised no significant issue of policy, and no referral from the PSA to the Bank Board was necessary.

The Court in *Fifth Third II* explained that after the 1982 delegation PSAs had implied actual authority to bind FHLBB, based on the fact that "[t]he ability of the regional banks to make promises regarding the use of supervisory goodwill ... was integral to fulfilling their role in FHLBB's policy to en-

courage the private acquisition of failing thrifts." *Id.* In other cases, this Court has held that subsequent to the delegation made in February 1982, PSAs had authority to bind FHLBB to promises regarding goodwill. *See Commercial Fed. Corp.*, 55 Fed.Cl. at 618; *First Fed. Lincoln*, 54 Fed.Cl. at 453; *Southern Nat'l Corp. v. United States*, 54 Fed.Cl. 554, 558 (2002); *CalFed I*, 39 Fed.Cl. at 777 n. 28 (holding, alternatively, that PSAs could legally bind FHLBB by express authority, implied actual authority, or ratification by FHLBB). *Cf. Home Fed. Bank of Tenn., FSB v. United States*, 57 Fed.Cl. 676, 687–89 (2003) (concluding that PSAs lacked authority to contract with respect to two transactions because they were entered into before the 1982 delegation). Here too, the PSA of FHLB–Atlanta had implied actual authority under the amended regulations to bind FHLBB to promises relating to American Federal's amortization and use of goodwill toward regulatory capital resulting from its acquisitions of Family and Bell. The government's challenges to the PSA's authority respecting the Bell and Family merger transactions thus are unavailing.

### 2. *Mutuality of intent to contract.*

██ An objective manifestation of voluntary, mutual assent is a precondition for contract formation. *Anderson*, 344 F.3d at 1353 (citing *Restatement (Second) of Contracts* § 18 (1981) (hereafter "*Restatement Contracts*")); *see also Fifth Third I*, 52 Fed.Cl. at 270 ("Absent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise."). To prove mutual assent, a plaintiff must proffer evidence demonstrating the existence of an offer and reciprocal acceptance. *Anderson*, 344 F.3d at 1353 (citing *Estate of Bogley v. United States*, 206 Ct.Cl. 695, 514 F.2d 1027, 1032 (1975); *Restatement Contracts* § 22(1)).

### (a.) *Offer.*

██ "[A]n offer is made by 'the manifestation of willingness to enter into a bargain, so made as to justify another person in under-

standing that his assent to that bargain is invited and will conclude it.' " *Anderson,* 344 F.3d at 1353 (quoting *Restatement Contracts* § 24; citing Richard A. Lord, *Williston on Contracts* § 4:13, at 367 (4th ed.1990)). The issue here is whether American Federal's merger applications reflected an offer to consummate the mergers if the government agreed American Federal could use the purchase method of accounting and could amortize the resulting goodwill over forty years.[8]

All four of American Federal's merger applications explicitly stated that the proposed mergers would be based on the purchase method of accounting in accordance with Memorandum R–31b and that a forty-year amortization period would be applied. The Bell and Family applications referred to Memorandum R–31b in the "Terms" paragraph of the Letter of Intent Agreement, which immediately preceded the Merger Agreement. J.A. Tab 10 at AF31 00959; Tab 14 at 0448. The Home and United applications made such reference in the "Miscellaneous Documents" section of the applications. J.A. Tab 2 at 0073; Tab 6 at 0221. The United and Home applications to FHLBB specified and used a forty-year amortization period in the goodwill calculation tables showing on *pro forma* basis the financial condition of the resulting entity should the applications be approved. J.A. Tab 2 at 0077; Tab 6 at 0223. In the "Financial Data" included with the Bell and Family applications to the PSA, American Federal explicitly proposed to amortize goodwill over a forty-year period. J.A. Tab 10 at AF31 01000; Tab 14 at 0483.

The inclusion of definite terms regarding creation and amortization of goodwill in American Federal's applications is a strong point· in American Federal's favor in this case. This reliance on definite terms regarding goodwill has counterparts in the *Anderson* and *First Federal Lincoln* cases. In *Anderson,* Westport's offer was manifested through its application to acquire Dade, subsequent amendments to that application, and letters provided by Westport's and Dade's accountants. 344 F.3d at 1353. In a letter to the Bank Board included as part of a second amendment to its application, Westport stated that it planned to use purchase accounting and amortize the resulting goodwill over forty years by use of the straight-line method. *Id.* at 1354. In its final letter, Westport modified the requested amortization period to twenty-five years. *Id.* In these circumstances, the Federal Circuit found that "[d]espite this modification in the requested amortization period, it is clear that, in exchange for acquiring the financially ailing Dade S & L, Westport wanted the Bank Board's promise to allow straight-line amortization of regulatory goodwill over an extended period. In other words, this particular accounting treatment for supervisory amortization of goodwill was a condition of Westport's offer." *Id.*[9] Similarly, in *First Federal Lincoln,* a letter of agreement in principle between ·Lincoln and Great Plains stated that the merger was subject to the Bank Board's acceptance of the purchase accounting method and amortization of goodwill over a minimum of thirty years. *First Fed. Lincoln,* 54 Fed.Cl. at 453. Lincoln specifically integrated the terms of the letter into the merger agreement, which was included as part of the application. *Id.*[10]

---

8. American Federal has suggested that Memorandum R–31b itself is the government's offer and that American Federal's applications are its acceptances. However, Memorandum R–31b could not constitute an offer because it is bereft of definite terms. American Federal could have had no justification that its applications in accordance with the guidelines allowed by Memorandum R–31b would conclude the bargain by reciting definite terms.

9. During its subsequent negotiations with the Bank Board staff, Westport, through Mr. Paul, eventually modified its offer by relenting on its demand for extended amortization of goodwill. *Anderson,* 344 F.3d at 1358.

10. American Federal's applications to acquire United and Home are similar to Lincoln's merger agreements to acquire Tri–Federal and Norfolk, where the Tri–Federal and Norfolk merger agreements lacked integration clauses and referred only to the purchase-method term. *See First Federal Lincoln,* 54 Fed.Cl. at 454. "The only reference to the twenty-five year amortization of goodwill in the Tri–Federal and Norfolk merger applications was buried within the goodwill calculations contained in their merger applications." *Id.* In the Court's judgment, "at first blush, the absence of any reference to definitive amortization periods in the merger agreements of Tri–Federal and Norfolk, suggest[s] that amortization of goodwill was not central to these two

In American Federal's applications, it arguably "made an offer to the government to acquire [the four troubled savings and loans] in exchange for, inter alia, the ability to amortize supervisory goodwill over an extended [forty-year] period of time," just as in *Anderson,* 344 F.3d at 1353. The purchase method and period of amortization terms were expressly stated in American Federal's original applications and were not modified prior to the government's approvals. In addition, unlike the transactions at issue in *Anderson* and *First Federal Lincoln,* American Federal explicitly referred to Memorandum R–31b in each of its applications. *See supra,* at 431-32. Finally, it is immaterial that American Federal's terms appeared in a Letter of Intent Agreement, which was made part of the applications, or in a Miscellaneous Documents section of its applications. *See Fifth Third I,* 52 Fed.Cl. at 273 n. 14 ("The court perceives no difference whether the particulars regarding accounting and regulatory treatment were contained in the [merger] agreement or in another part of the application."). As the Federal Circuit observed in *Anderson,* in *CalFed II* it rejected the "single integration" theory and "acknowledged that multiple related documents, when read together, could provide evidence of an intent to contract." *Anderson,* 344 F.3d at 1354 (citing *CalFed II,* 245 F.3d at 1346–47). It is likewise true that multiple related parts of an application, when read together, can constitute an offer.

The alleged offers in this case are distinguishable from other recent cases in which summary judgment was either granted in favor of the government or cross-motions for summary judgment were denied. In *D & N Bank v. United States,* 331 F.3d 1374 (Fed. Cir.2003), for example, "none of the documents proffered by D & N mention[ed] goodwill or the accounting treatment thereof," *id.* at 1378, and "the application for merger, which was lengthy and had many attachments, contained no specific reference to a commitment for long-term amortization," *id.* at 1376. In *Advance Bank,* "the only submitted documents mentioning the forty-year amortization of goodwill appear to have been intended solely for the internal use of one or the other party and never to have been communicated between them." 52 Fed.Cl. at 290. Finally, in *Southern National,* the plaintiff "ha[d] not provided documentation supporting a request for a lengthened amortization period prior to governmental approval of the mergers." 54 Fed.Cl. at 560.

### (b.) Acceptance.

"For a contract to be formed once an offer is made, there must be an acceptance, i.e., a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Anderson,* 344 F.3d at` 1355 (quoting *Restatement Contracts* § 50(1)). In *D & N Bank,* the Federal Circuit maintained that "[s]omething more [than mere regulatory approval] is necessary" to create contractual obligations. 331 F.3d at 1379. As the *Anderson* court explained, "[t]hat 'something more' must be, according to our precedent, a 'manifest assent to the same bargain proposed by the offer.'" 344 F.3d at 1356 (quoting *Restatement Contracts* § 50 cmt. a). "Perhaps, the Court of Claims best captured this requirement for 'something more' when it explained that, to create a contract, '[t]he offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly.'" *Anderson,* 344 F.3d at 1357 (quoting *Estate of Bogley,* 514 F.2d at 1032).

In *Anderson,* the court found that a provision in a Bank Board Resolution requiring that an acquiring institution submit accounting analyses detailing its treatment of goodwill resulting from purchase accounting was "nothing more than regulatory boilerplate,

---

mergers, as compared to the utilization of purchase accounting, which was explicitly referenced in the application." *Id.* However, in *First Federal Lincoln,* the Court held that genuine issues of material fact were presented respecting intent to contract, pointing to the observation in *Home Savings of America, FSB v. United States,* 50 Fed.Cl. 427, 437 (2001), that "'[t]he only

logical reason for the inclusion in the agreements of amortization schedules is that the schedules reflect the regulatory interest of the FHLBB and the FSLIC. If there had been no understanding that supervisory goodwill would count in meeting regulatory capital requirements, there would have been no need to amortize goodwill.'" *First Fed. Lincoln,* 54 Fed.Cl. at 457.

added by the Bank Board as a regulator rather than as a contractor." *Anderson*, 344 F.3d at 1357. *Accord D & N Bank*, 331 F.3d at 1378–79. The provision at issue in *Anderson* was substantially equivalent to Condition 2 of the Bank Board's resolutions approving the United and Home mergers in this case, quoted *supra*, at 432 n. 6, to Condition 4 of the PSA's letter approving the Family merger, J.A. Tab 11 at 0433, and to Condition 5 of the PSA's letter approving the Bell merger. J.A. Tab 15 at 0537. American Federal must find the "something more" to form a contract elsewhere. The evidentiary materials submitted with the cross-motions for summary judgment are not conclusive on the issue; rather, they show that genuine disputes of material facts exist regarding acceptance.

First, the language of the two Bank Board Resolutions and two PSA letters is sufficient to allow a reasonable finder of fact to conclude that the government bound itself to allowing American Federal to use the purchase method of accounting. It is true that, unlike the Resolution in the Glendale transaction at issue in *Winstar*, the four conditional approvals in this case did not expressly use the term "purchase method of accounting." *Winstar II*, 64 F.3d at 1540. However, as the Court in *Citizens Federal Bank, FSB v. United States*, 51 Fed.Cl. 682, 687 (2002), explained, this difference is "insignificant." By explicitly referring to goodwill in the Resolution approving the Equitable transaction in the *Citizens Federal* case, the government "implied that Plaintiff was entitled to use the purchase method of accounting. In a business combination scenario, one records goodwill only if one is using the purchase method of accounting." *Id.* "A promise may be express or implied, but is to be distinguished from mere statements of intention, opinion, or prediction." *Fifth Third I*, 52 Fed.Cl. at 270 (citing *Cutler–Hammer, Inc. v. United States*, 194 Ct.Cl. 788, 441 F.2d 1179, 1182–83 (1971) ("In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention.")). In its four conditional approvals of American Federal's mergers, the government's accep-

tance of American Federal's offer to use purchase accounting was implicit.

Second, the conditional approvals at issue here did not expressly accept American Federal's offer to amortize goodwill over forty years. In contrast to the Resolution approving the Glendale merger at issue in *Winstar*, the approvals of American Federal's transactions did not expressly refer to Memorandum R–31b, which indicated the Bank Board could provide for an amortization period up to forty years in length. However, the Resolutions and approvals here did expressly require American Federal to use GAAP. *See supra*, at 432 & n. 6. Because Memorandum R–31b described FHLBB's guidelines with respect to accounting for supervisory goodwill under GAAP, a specific reference to Memorandum R–31b would have been redundant. *Citizens Federal*, 51 Fed.Cl. at 686–87; *accord Fifth Third I*, 52 Fed.Cl. at 273 n. 14. In all events, the Glendale resolution in *Winstar* and the Equitable resolutions in *Citizens Federal* referred only to the maximum periods of amortization allowable under GAAP, not the actual amortization periods to which the parties eventually agreed. *Citizens Federal*, 51 Fed. Cl. at 687. "In both transactions, the actual periods of amortization were not agreed to until the independent accountants submitted their opinion letters." *Id.*

The end result of the American Federal transactions is comparable. Both the Bank Board's resolutions and the PSA's conditional approvals allowed the actual use of a forty-year amortization period through the submission and receipt of analyses and accountants' opinions and the approval by the PSA of those analyses and opinions. "When the plaintiffs satisfied the conditions imposed on them by the contracts, the government's contractual obligations became effective and required it to recognize and accept the purchase method of accounting for the mergers and the use of supervisory goodwill and capital credits as capital assets for regulatory capital requirements." *Winstar II*, 63 F.3d at 1545; *accord Citizens Federal*, 51 Fed.Cl. at 688; *cf. Anderson*, 344 F.3d at 1358 ("Alternatively, the evidence may also support a construction of this situation as a counter-offer resulting from the Bank

Board's exclusion of the amortization terms from its acceptance, with the possible ensuing acceptance of the counter-offer by conduct.") (citing *First Commerce*, 335 F.3d at 1381–82). Satisfaction of the conditions imposed by the government on American Federal is discussed *infra*, at 441 – 42.

Third, there is substantial evidence that the government bound itself to allowing American Federal to use supervisory goodwill toward regulatory capital requirements. An explicit promise regarding this term is unnecessary if there is a specific reference in the merger documents to 12 C.F.R. § 561.13 (1981) (repealed), which allowed use of intangible assets in computing regulatory capital. *See Southern Cal. Fed. Savs. & Loan Ass'n v. United States*, 52 Fed.Cl. 531, 545 (2002) *("SoCal")* (citing *Winstar III*, 518 U.S. at 862–63, 867–69, 116 S.Ct. 2432). In such a case, the government's promise to allow use of goodwill toward capital requirements is "subsumed" in its initial promise to permit utilization of purchase method accounting and a longer amortization period. *Id; accord First Fed. Lincoln*, 54 Fed.Cl. at 456–57. The Bank Board's Resolutions granting conditional approval of American Federal's acquisition of United and Home specifically stated that American Federal "shall compute its net worth requirement pursuant to Insurance Regulation Section 563.13." J.A. Tab 3 at 0143; Tab 7 at 0334. Section 561.13 defined net worth and contained a cross-reference to 12 C.F.R. 563.13, which set out the net worth requirement.

Fourth, here, in contrast to the *SoCal* documents and the Regulatory Capital Maintenance Agreement governing the Statesman transaction in *Winstar*, the condition citing 12 C.F.R. § 563.13 (1981) (repealed) in the United and Home Resolutions did not add the words "or any successor regulations, as now or hereafter in effect." *See Winstar III*, 518 U.S. at 867, 116 S.Ct. 2432; *SoCal*, 52 Fed.Cl. at 545. The government in those cases raised an assumption of risk defense, arguing that the successor-regulation language placed on the plaintiff the risk that the regulations could change. *Winstar III*, 518 U.S. at 868, 116 S.Ct. 2432; *SoCal*, 52 Fed. Cl. at 545. Rejecting this defense, the

Courts reasoned that because these transactions included assistance agreements, the then-current regulations were specifically incorporated into the agreements. *Winstar III*, 518 U.S. at 868, 116 S.Ct. 2432; *SoCal*, 52 Fed.Cl. at 545–47. Here, the Bank Board Resolutions specifically imposed as a condition to the transactions "a then-concrete statutory scheme," which is evidence that the risk of regulatory change was assigned to the government. *SoCal*, 52 Fed.Cl. at 546; *accord Winstar III*, 518 U.S. at 868–70, 116 S.Ct. 2432. Unlike *Advance Bank*, in which "the court ha[d] uncovered no reference whatsoever, conditional or otherwise, to the government['s] approving plaintiff's use of supervisory goodwill to satisfy any regulatory capital requirements beyond the five-year forbearance period," 52 Fed.Cl. at 290, the Bank Board's Resolutions in the United and Home transactions at issue here adopt only then-existing regulations without providing for future changes in those regulations.

The PSA letters conditionally approving the Bell and Family mergers did not contain a specific reference to Section 563.13. As the Court has explained, however, "[t]he mere presence of an amortization schedule in the contract" implies that the parties agreed that supervisory goodwill would qualify as regulatory capital. *Home Savs.*, 50 Fed.Cl. at 437. "If supervisory goodwill was not considered by the parties to be a capital asset for regulatory purposes, a contractual amortization schedule designed to eliminate it over time would have been completely unnecessary." *Id.* In *Home Savings*, an amortization schedule was reflected in the Bank Board's resolutions, which explicitly stated that goodwill would be amortized over forty years. *Id.* As discussed earlier, none of the four conditional approvals of American Federal's transactions contained a specific amortization schedule. Rather, the forty-year amortization period put forward in the applications was to be later substantiated in analyses and accountants' opinions.

In short, genuine disputes of material fact exist respecting whether the government accepted or conditionally accepted American Federal's offer to contract, or whether the government by its conditional approvals

made a counteroffer to American Federal which then could be accepted either by fulfillment of the conditions or by conduct.[11]

### (c.) *Satisfaction of conditions.*

In the case before the Court, each of the four governmental approvals contains language substantially similar to the following: the merger "is hereby approved; provided, that the following conditions of this resolution are complied with in a manner satisfactory to the [Board's] Supervisory Agent at the Federal Home Loan Bank of Atlanta." J.A. Tabs 3, 7, 11, 15. The materials submitted by the parties are ambiguous as to how American Federal complied with the condition at issue, in which it was required to submit analyses and an accountant's opinion describing goodwill and substantiating its amount and "the related [amortization] periods and methods." *Id.* Three of the letters from American Federal's accounting firm, Coopers & Lybrand,[12] stated that "we were requested to review the purchase accounting adjustments resulting from such merger."

J.A. Tabs 5, 13, 17.[13] They confirmed that the use of this method of accounting was in compliance with the government's condition, concluding, "[s]uch methodology appears reasonable and in accordance with provisions indicated in APB Opinion No. 16 and FASB Interpretation No. 9." *Id.* However, the accounting firm did not express an opinion as to the reasonableness of the amount of goodwill or its period of amortization. *Id. See Winstar II*, 64 F.3d at 1541 (commenting on the Glendale transaction, where such an opinion was given); *Citizens Federal*, 51 Fed.Cl. at 688 (commenting on the Citizens acquisition where such an opinion was also given).[14] A separate submission was made on those points. American Federal's statement of financial condition for each of its merger partners, which it submitted in compliance with another condition of the approvals, provided detailed analyses describing the resulting goodwill and substantiating both its amount and amortization period. American Federal attached to each such statement explanations and tables calculating the amounts of goodwill resulting from the proposed mergers. It

11. That the government's approvals were conditional does not establish that its acceptances of contracts were conditional. *See Restatement Contracts* § 59, cmt. b; *Williston on Contracts*, § 6:15, at 122. A conditional acceptance is one that contains terms additional to or different from those offered, and is thus treated as a counteroffer, which operates to reject the original offer. *See First Commerce Corp.*, 335 F.3d at 1381 (quoting *Restatement Contracts* § 59); *Williston on Contracts*, § 6:13, at 104–6. If, however, a condition added is one that is implied in fact or in law from the offer, the acceptance is not conditional and does not preclude contract formation. *Restatement Contracts* § 59, cmt. b; *Williston on Contracts*, § 6:15, at 122. In the instant case, the condition requiring the submission of analyses and an accountant's opinion arguably was implied in law from the rules regarding applications for mergers. The Bank Board's regulations stated: "The proposed treatment of goodwill in connection with the merger must be fully described in the application. The computation and amortization of goodwill should be in accordance with accounting policies of the Board at the time the application is filed." 12 C.F.R. § 571.5(e) (1982) (repealed). An accountant's opinion was expressly required by Memorandum SP–24, which provided internal guidance regarding how to determine whether purchase method accounting was appropriate under GAAP and how to apply this method to a particular acquisition. Def.App. at 112, 123. The condition in the PSA approvals may also

have been implied in law, because the PSA had such delegated authority only if the applicant submitted an accountant's opinion that the goodwill was accounted for in accordance with Memoranda R–31b and SP–24. 47 Fed.Reg. 8152 (Feb. 25, 1982).

Even if the government's conditional approvals were construed as conditional acceptances, and thus as counteroffers, a similar analysis would apply; the question would become whether American Federal satisfied the condition by submitting analyses and accountants' letters, thereby accepting the counteroffers.

12. The accountant's opinion for the Home transaction is not contained in the Joint Appendix. Rather, the letter from the Supervisory Agent of FHLB–Atlanta confirming receipt and completeness of American Federal's compliance with the conditions for Home is included. J.A. Tab 9.

13. The accounting firm stated that it was "not the independent accountant[ ] of American," whereas the conditional approvals specified that American Federal's independent accountant shall provide the concurring opinion.

14. In *Winstar*, the Bank Board's Resolution in Glendale, unlike that in *Citizens Federal* and here, required only an opinion from an independent accountant, not analyses accompanied by a concurring opinion from the independent accountant. *See Winstar II*, 64 F.3d at 1540.

also stated explicitly its intent to amortize goodwill over a forty-year period. J.A. Tab 4 at AF31 00257; Tab 8 at AF31 00898; Tab 12 at 0438; Tab 16 at 0545. This evidence indicates that American Federal arguably satisfied the government's conditions on each merger. And, as previously noted, the documentary materials provided by the parties contain a confirmation by the PSA for FHLB–Atlanta that the conditions for the Home merger had been satisfied, J.A. Tab 4, but the present record is silent as to explicit confirmation of the conditions for the other mergers. The parties' subsequent conduct also bears on this issue.

### (d.) Subsequent conduct.

American Federal followed through with its offer to amortize goodwill over forty years, apparently with the acceptance of the government. Compl. ¶ 25. This was so even though by 1982, "practice evolved to the point where the maximum goodwill life that could be justified to the staff [of the Bank Board] was 25 years." Staff Accounting Bulletin No. 42A, 51 Fed.Reg. 739, 740 (Jan. 8, 1986). Moreover, the amortization period was supposed to be "based on the estimated life of the loans and investments." Staff Accounting Bulletin No. 42, 46 Fed.Reg. 63,-252, 63,253 (Dec. 31, 1981). American Federal's applications indicate that the estimated life of the loans held by each of the four thrifts was at most twenty years, not forty years.[15]

In support of its contention that the forty-year amortization period was a bargained-for term, American Federal points to its conversion in 1989 from mutual to stock ownership. Compl. ¶¶ 26–29. Prior to approving the conversion, the Bank Board requested American Federal to reduce the amortization period from forty to twenty-five years in accordance with SAB 42A. Id. ¶ 27. American Federal ultimately reduced the period to 23.25 years. Id. The government contends that "[t]his unilateral reduction of the amortization period prior to FIRREA is solid evi-

dence that AmFed did not believe that it had a contract with the Government with respect to the period of time over which the goodwill could be amortized." Def.'s Opp. at 25–26. American Federal responds that the Bank Board, following SEC guidance, "recognized at that time that [it] could not force American Federal to abandon its contractual rights entirely, and thus negotiated with American Federal in connection with the proposed conversion to determine an acceptable amortization period." Pl.'s Reply at 8. Respecting confirmation of an earlier contract, inferences from this evidence can be drawn in favor of both parties. Also, the negotiation of this revised amortization schedule might be construed as an agreed amendment of a prior contract for amortization of supervisory goodwill. Alternatively, the negotiated result might amount to a new contract in 1989 for such amortization, if it is ultimately determined that no contracts for recognition and amortization of supervisory goodwill were entered in connection with the mergers in 1982.

### 3. Other contractual indicia.

American Federal avers that as a result of the deterioration of the FSLIC insurance fund during the early 1980s, the Bank Board actively encouraged "healthy" financial institutions to acquire failing thrifts in exchange for use of the purchase method of accounting. Compl. ¶¶ 13–14. However, " '[t]he fact that the Government may have been willing to encourage a given transaction by promising certain regulatory treatment does not eliminate the dispute as to whether it actually made such a promise. The Court of Federal Claims cannot imply a contract as a legal conclusion where no such contract exists as a matter of fact.' " Southern Nat'l, 54 Fed.Cl. at 561 (quoting Fifth Third I, 52 Fed.Cl. at 277).

In addition to the merger documents, American Federal relies on evidence of the economic circumstances of the transactions.

---

**15.** The average remaining term for United's mortgage loans was 20.34 years, and five years for its "other loans." J.A. Tab 4 at AF31 00259. The average life of Home's mortgage loans was estimated at 15.46 years, its home improvement loans at five years, and its consumer loans at three years. J.A. Tab 8 at AF31 00900. The average remaining term for Family's and Bell's mortgage loans was twenty years. J.A. Tab 12 at 0440 (Family); Tab 16 at 0547 (Bell).

It alleges that it would have been instantly insolvent by almost $50 million if it had not been allowed to include goodwill in calculating its capital requirements. Pl.'s Mot. for Partial Summ. J. on Liability at 14. *See also supra,* at 433. Yet the fact that a merger may constitute "madness" absent a contract for amortizing goodwill over a lengthened period does not by itself prove the existence of a contract. *Southern Nat'l,* 54 Fed.Cl. at 561 (citing *Winstar III,* 518 U.S. at 910, 116 S.Ct. 2432). "The question is 'whether each party would have engaged in the transaction absent the existence of a binding contract-insolvency is not the determinative factor.'" *Southern Nat'l,* 54 Fed.Cl. at 561 (quoting *CalFed I,* 39 Fed.Cl. at 768).

The government argues that American Federal pursued a strategy of acquiring smaller thrifts to survive the economic downturn in the thrift industry at the time. Def.'s Opp. at 4–5. The government points out that American Federal's predecessor, Fidelity Federal, first attempted to acquire Bell in 1979, before Memorandum R–31b had been issued. *Id.* at 5. American Federal responds that its failed attempt to acquire the still healthy Bell does not prove that it would have acquired Bell when it was a failing thrift without contracting with the government to treat supervisory goodwill as regulatory capital. Pl.'s Reply at 4–5. As in *Southern National,* these disputed inferences and evidence create a genuine issue of material fact and preclude summary judgment. 54 Fed.Cl. at 561.

American Federal also relies on deposition testimony to support its position that the terms of its transactions resulted from bargained-for exchanges with the government. For example, Thurman Connell, the Supervisory Agent of FHLB–Atlanta at the time of the acquisitions, answered in the affirmative the question whether he "believed that American Federal could rely on having goodwill that resulted from the application of purchase accounting to the four mergers ... as an element of its regulatory capital for the entirety of the amortization period described in these documents." Pl.'s App., Tab 15 at 753. Mr. Connell further acknowledged that the condition requiring analyses and a con-

curring accountant's opinion indicates there was an "agreement" between American Federal and the government whereby the former could count resulting goodwill toward regulatory capital for each transaction. *Id.* at 719, 725–26, 737–38, 750. In addition, American Federal's officers testified that they believed they had contracted with the government. *See* Pl.'s App., Tab 1 at 420, 423–24, 456 (Deposition of Don Bolt, American Federal's President and senior operating officer during 1981–82, stating he believed American Federal had contracted with the government to use purchase method accounting and treat the resulting goodwill as regulatory capital); Tab 2 at 194–95 (Deposition of William Merritt, Chairman of the Board, stating the Bank Board agreed that goodwill would be considered as net worth and amortized over forty years); Tab 3 at 437–38 (Deposition of George Campbell, American Federal's Chief Financial Officer, testifying to his understanding that the Bank Board had agreed to allow American Federal to use purchase method accounting).

American Federal also relies on the depositions of the former officers of the acquired thrifts, who testified that they felt pressured by the Bank Board to find a merger partner. *See* Pl.'s App., Tab 4 at 66 (Deposition of Pat Foster, President of Home, stating "we felt that while we were not a burden-or [were] not in violation of the regulations, that we would be better to merge before our reserves became depleted"); Tab 8 at 101–106 (Deposition of Blake Garrett, Jr., Director of United, testifying that his institution was instructed by the regulators to find a merger partner); Tab 5 at 153–54 (Deposition of X.L. McMahan, Chief Executive Officer of Bell, testifying to the same); Tab 7 at 37–40 (Deposition of James P. Edwards, Chairman of the Board of Family, same). Finally, American Federal points to evidence showing that the four acquisitions were "supervisory" in nature. *See* Pl.'s App., Tab 32 at OAF001 2389 (Memorandum from OTS Supervisory Examiner J. Laurence Sykes to Alvin W. Smuzynski dated March 5, 1990, stating his review of the records indicates "that American's goodwill should be considered 'supervisory' pursuant to 12 C.F.R. Section 567.1(ee))"; Tab 13 at 467–69 (Deposition of

Jon Mark Rundle, Regional Director of FHLB–Atlanta, answering affirmatively that American Federal's transactions were "supervisory mergers").

None of the evidence proffered by American Federal is dispositive of the government's intent to contract. First, regarding the testimony of Thurman Connell, the Federal Circuit has opined that it is uncertain how such testimony by a government official is relevant without an explanation of the basis for the government official's opinion or testimony by the official about specific representations made by the government to the plaintiff. *D & N Bank*, 331 F.3d at 1379. Second, the deposition testimony by American Federal's officers is "conclusory and unilateral." *Advance Bank*, 52 Fed.Cl. at 290. Third, evidence that the government instructed American Federal's merger partners to find a partner with whom to merge is not, by itself, probative of the government's intent to contract with American Federal. Similarly, the evidence about the "supervisory" nature of the mergers, "alone ... would tell us nothing about the government's intent to contract." *D & N Bank*, 331 F.3d at 1380. Finally, the evidence on which American Federal relies does not include "contemporaneous correspondence" or "substantial evidence of alleged negotiations." *See Southern Nat'l*, 54 Fed.Cl. at 561–62 (discussing a supervisory agent's telephone logs). *See also First Fed. Lincoln*, 54 Fed.Cl. at 457 (discussing testimony of the Chairman of the Board of plaintiff bank that he negotiated with FHLBB for the amortization period term). Rather, the depositions here were all taken in the year 2000, and the memorandum from Mr. Sykes was written in 1990. Moreover, they do not specifically relate to a process of negotiation.

The government disputes American Federal's reliance on this evidence by pointing to conflicting deposition testimony. For example, Mr. Bolt testified to his understanding that the duration of the contract would be forty years, Def.'s App. to Motion for Summ. J. at 527, whereas Mr. Merritt believed it was "indefinite." *Id.* at 552–53. Further, several officials of the acquired institutions testified that they did not view goodwill as an essential component of their merger agreements with American Federal. Def.'s App. to Opp. at 74 (Garrett Tr.); 87–88 (Foster Tr.); 132 (Edwards Tr.). Mr. McMahan testified that the supervisory agent did not tell him that Bell had to find a merger partner, Def.'s App. to Opp. at 27–28, and Mr. Foster stated the same about Home. *Id.* at 83–84. Mr. Connell indicated that United and Home were "financially sound and ha[d] operated without major supervisory concern," Def.'s App. to Reply at 34, and that the mergers were not induced by a "regulatory promise regarding the treatment of goodwill," *id.* at 31–32. Likewise, Beth Lanier, Supervisory Agent, Applications Department, FHLB–Atlanta, stated her belief that the mergers were not supervisory. *Id.* at 44–45. Finally, George Campbell, the CFO of American Federal, testified that the mergers enabled American Federal to survive the capital shortage of the early 1980s. *Id.* at 6–7.

In short, genuine issues of material fact exist regarding the intent of the parties to form a contract regarding supervisory goodwill and amortization of that goodwill over a specific term of years.

### 4. Consideration.

"[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Restatement Contracts* § 17(1). Consideration "refers to an element of exchange which is legally sufficient." *Id.* at § 17, cmt. d. *See generally Williston on Contracts* § 7:3.

In the *Winstar* context, the government used economic inducements, including supervisory goodwill and capital credits, which "inflated the acquiring thrift's regulatory capital and permitted leveraging of more and more loans" (and, the acquiror hoped, make more profits). *Winstar III*, 518 U.S. at 853, 116 S.Ct. 2432; *accord, e.g., Home Savs. of Am., FSB v. United States*, 57 Fed.Cl. 694, 699 (2003). In return, the Bank Board, realizing that FSLIC did not have funds sufficient to liquidate all of the failing thrifts, avoided insurance liability, at least temporarily. " '[T]he action taken by the purchasing [institution] in acquiring the failing thrift did not

result in the Government ... saving the dollar value of the net obligations of the thrift .... In a very real sense, what the Government received in exchange for its promise was time.'" *Fifth Third Bank of W. Ohio v. United States,* 56 Fed.Cl. 668, 687 (2003) (quoting *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1382 (Fed.Cir. 2001)). Thus, if there is a contract in this case, there is no genuine dispute over whether consideration for mutual promises exists.

### C. Implied–In–Fact Contract

As an alternative to its express contractual claim, American Federal relies on an implied-in-fact contractual theory. An implied-in-fact contract is one in which "there is a meeting of the minds which can be inferred from the parties' conduct showing, in light of the surrounding circumstances, a tacit understanding [of an agreement] between them." *AG Route Seven P'ship v. United States,* 57 Fed.Cl. 521, 528 (2003) (quoting *Martinez v. United States,* 48 Fed.Cl. 851, 860 (2001), *aff'd,* 281 F.3d 1376 (Fed.Cir.2002)). The elements of such a contract are the same as those required for express contracts. *See supra,* at 434. "The test is whether 'the parties' conduct indicates that plaintiff and defendant, in fact, took upon themselves *corresponding obligations and liabilities* and, viewed objectively, came to that meeting of the minds sufficient to establish an implied-in-fact contract.'" *AG Route Seven,* 57 Fed. Cl. at 528 (quoting *City of El Centro v. United States,* 16 Cl.Ct. 500, 506 (1989), *rev'd on other grounds,* 922 F.2d 816 (Fed.Cir. 1990)). More specifically, an implied-in-fact contract exists if, "when these separate documents are read in tandem, they collectively reflect not only the full intent of the parties, but the actual events that flowed from their agreement." *AG Route Seven,* 57 Fed.Cl. at 536.

In *La Van v. United States,* 53 Fed.Cl. 290, 298 (2002), the Court found the existence of an implied-in-fact contract based on the acquirors' proposal to deviate from GAAP, which "was absolutely necessary to make the conversion viable for the acquirors." The documents on the record demonstrated that the acquirors' request for nonconforming accounting treatment of goodwill required "special approval," without which the acquiring institution would have failed its net worth requirement. *Id.* These "facts and circumstances ... establishe[d] a bargained-for agreement in which the acquirors agreed to infuse capital into the institution, and thus save the bank from immediate liquidation, based on the express understanding that they would in exchange receive the above-specified treatment of goodwill." *Id. See also id.* at 297 ("A review of the undisputed facts of this case demonstrates that the FHLBB specifically acquiesced to the acquirors' request for special treatment of goodwill in order to keep the FHLBB from having to liquidate [the acquired thrift].").

In the instant case, however, the relevant facts and circumstances remain in dispute. As previously discussed, American Federal's request to amortize goodwill over forty years deviated from the twenty-five year maximum specified as the "practice" at the time as well as the policy that the amortization period be based on the estimated life of the loans. *See supra,* at 442. American Federal's accountant's letters, nonetheless, stated that its applications were in conformity with the government's conditions for the merger. *See supra,* at 433, 441. *See also Southern Nat'l,* 54 Fed.Cl. at 560 ("In this case, First Federal's use of purchase accounting in accordance with GAAP (in contrast to *La Van* ) does not definitively answer the question whether the four transactions were contractual or regulatory in nature."). Second, although it is true that American Federal could not have acquired the four thrifts without using purchase accounting, it is not entirely evident that the specific amortization period of *forty* years "was critical to the agreement." *La Van,* 53 Fed.Cl. at 298. Thus, not surprisingly, the same types of genuine issues of material fact arise with American Federal's implied-in-fact contractual claim as appear with its claim based on an express contract.

### D. Breach of Contract.

If American Federal is able to prove at trial the elements of contract formation, then *ipso facto* it will have proven that the government breached these contracts. As the plurality in the Supreme Court's decision in

*Winstar III* concluded, "[w]hen the law as to capital requirements changed ..., the Government was unable to perform its promise and, therefore, became liable for breach. We accept the Federal Circuit's conclusion that the Government breached these contracts, when, pursuant to the new regulatory capital requirements imposed by FIRREA ..., the federal regulatory agencies limited the use of supervisory goodwill ... in calculating respondents' net worth." 518 U.S. at 870, 116 S.Ct. 2432. *Accord, e.g., CalFed II,* 245 F.3d at 1347–48; *La Van* 53 Fed.Cl. at 299; *Citizens Federal,* 51 Fed.Cl. at 688; *Home Savs.,* 50 Fed.Cl. at 438–39. American Federal alleges that the enforcement of FIRREA and implementing regulations eliminated $48.7 million of goodwill from tangible capital and $32.7 million from core and risk-based capital. Compl. ¶ 35.

## CONCLUSION

"It is well-settled that 'the Court neither may make credibility determinations nor weigh the evidence and seek to determine the truth of the matter' when resolving a motion for summary judgment." *First Fed. Lincoln,* 54 Fed.Cl. at 458 (quoting *Fifth Third I,* 52 Fed.Cl. at 278). As in *Advance Bank,* a number of factual issues remain in dispute regarding contractual intent, particularly regarding (1) the extent to which the government played a substantive role in arranging the mergers; (2) the nature and scope of any negotiations regarding the use of purchase accounting and the amortization period for the supervisory goodwill created by that accounting; and (3) the role of American Federal's own financial circumstances in the mergers. *See Advance Bank,* 52 Fed.Cl. at 290–91. Thus, the parties' cross-motions for partial summary judgment on liability are DENIED.[16] A separate trial on liability will be held in this case. In accordance with RCFC Appendix A, ¶ 12, the parties are directed to file a joint status report by December 10, 2003, addressing the items in ¶ 12

16. The Court also grants Plaintiff's Motion for Leave to Notify the Court of New Authority (*Anderson v. U.S.*), filed October 1, 2003, and denies Defendant's Motion to Strike Certain Ex-

(last sentence) with respect to trial on liability.

IT IS SO ORDERED.

hibits to Plaintiff's Motion for Leave to Notify the Court of New Authority (*Anderson v. U.S.*), filed October 14, 2003.