**AMERICAN FEDERAL BANK, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–498C.

United States Court of Federal Claims.

Sept. 30, 2004.

Howard N. Cayne, Arnold & Porter, LLP, Washington, D.C., for plaintiff. With him at trial and on briefs were David B. Bergman, Michael A. Johnson, and Michael A. Sackey.

Jonathan S. Lawlor, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, and, at trial as well as on the briefs, Gregory R. Firehock, John N. Kane, and Edward P. Sullivan, Commercial Litigation Branch, trial attorneys.

---

**1.** *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

## OPINION AND ORDER

LETTOW, Judge.

This *Winstar*-related case[1] is before the court following a nine-day trial on issues of liability. For the reasons that follow, the court finds that contracts implied in fact concerning goodwill accounting were formed respecting each of four mergers at issue, that those contracts were subsequently modified and a substituted contract about goodwill accounting was entered in connection with a modified conversion of plaintiff thrift to a stock company, that a concurrent contract was formed regarding regulatory-capital treatment of a new issuance of subordinated debt, that the contracts were breached by the government, and that the government is liable for breach of those contracts.

## BACKGROUND

The train of events culminating in this lawsuit was triggered by three circumstances: (1) acute distress in the thrift industry in 1981, (2) efforts by the Federal Home Loan Bank Board ("FHLBB" or "Bank Board") and the Federal Savings and Loan Insurance Corporation ("FSLIC") to alleviate that distress, and (3) the desire of plaintiff American Federal Bank, FSB ("American Federal") to expand and strengthen its market presence in the upper Piedmont crescent section of South Carolina. An extensive review of the first two circumstances has been provided in *Winstar*, 518 U.S. at 844–858, 116 S.Ct. 2432.

This case was brought in 1995 and had been stayed pending resolution of the early bellwether *Winstar*-related cases. Cross-motions for partial summary judgment on liability were denied by this court on November 7, 2003. *American Fed. Bank, FSB v. United States*, 58 Fed.Cl. 429 (2003). Thereafter, a trial on liability was conducted from May 10 through May 20, 2004.

## FACTS

American Federal was a federally chartered savings and loan association based in Greenville, South Carolina.[2] In the course of

---

**2.** American Federal converted to a stock company in January 1989, after an approval granted by the Bank Board on November 30, 1988. Later, in 1997, two years after the complaint was filed,

a thirty-seven day period in April and May of 1982, American Federal received approval to acquire four troubled thrifts: (1) United Federal Savings & Loan Association of Fountain Inn, South Carolina ("United"), (2) Home Savings & Loan Association of Easley, South Carolina ("Home"), (3) Family Federal Savings & Loan Association of Greer, South Carolina ("Family"), and (4) Bell Federal Savings & Loan Association of Inman, South Carolina ("Bell"). Each approval followed the same pattern: the mergers were unassisted in the sense that neither the Bank Board nor FSLIC provided cash in connection with the transactions, but the mergers were accomplished using the purchase method of accounting, a forty-year amortization period was used for the intangible goodwill generated by the mergers, and American Federal "added" approximately $61.3 million of amortizing supervisory goodwill to its regulatory capital. The chain of events leading up to the merger agreements, applications for approval, and approvals illuminates the contract-formation issues.

The acquisitions were made possible by Bank Board Memorandum R–31b. PX 203.[3] That memorandum allowed acquiring thrifts to apply the purchase method to account for mergers, such that any excess amount paid by the acquiror over the net fair market value of the assets acquired and liabilities assumed was assigned to "goodwill" considered as an intangible asset for purposes of regulatory capital. *Id.* at AF31 00436. The resulting institution could count this goodwill toward meeting its regulatory net worth requirement, 12 C.F.R. § 563.13 (1981), and amortize it over a period up to forty years in duration. PX 203 at AF31 00436.[4]

American Federal had been pursuing an aggressive expansion of its activities, and Memorandum R–31b caused American Fed-

eral to shift its plans regarding how it could grow. Previously, in the late 1970s, American Federal had recognized that it needed to become more bank-like to survive and prosper as a financial institution. Tr. 177 (testimony of Donald Bolt, first executive vice-president and then president of American Federal). It aggressively pursued a marketing campaign to attract depositors and began to make consumer loans as well as home loans. Tr. 178. It offered customers Keough retirement accounts and established an insurance division as well as a finance company. Tr. 178–79. In addition, it hired an expert in NOW accounts and offered and emphasized those accounts in its marketing strategy to increase its deposit base. Tr. 178. In short, American Federal expanded its financial services and products and began to compete directly with banks as a more comprehensive financial institution, rather than merely pursuing a traditional thrift business.

As part of this transitional effort, American Federal sought to grow by adding branches in the Piedmont crescent area centered on Greenville, South Carolina. It initially explored mergers with smaller thrifts in the area, including Bell Federal which had four offices in the Spartanburg market. Stip. ¶ 28; DX 6; DX 7 at 1; Tr. 380–84. Those discussions did not reach fruition, except that American Federal did merge with a relatively new and small thrift, First State Savings & Loan Association, which had a single office in Clinton, South Carolina. Stip. ¶ 36. First State Savings of Clinton was an institution that had not been successful, and the Bank Board approved the merger transaction under its traditional guidelines. "First State had never operated at a profit since its inception in 1978 ... and it had only 1.19 percent net worth." Stip. ¶ 36 (citing

all of the stock in American Federal was acquired by CCB Financial Corporation, and American Federal was merged into that entity's subsidiary, Central Carolina Bank and Trust Company. In July 2000, CCB Financial Corporation merged with National Commerce Bancorporation. *See American Fed.,* 58 Fed.Cl. at 433.

3. The evidentiary record consists of Plaintiff's Exhibits ("PX"), Defendant's Exhibits ("DX"), and testimony provided at trial as reflected in the

trial transcript ("Tr."). In addition, pursuant to Rules of the Court of Federal Claims ("RCFC"), Appendix A, ¶ 17, counsel for American Federal and the government filed Stipulations of Fact ("Stip.") prior to the trial.

4. Memorandum R–31b revised the policy expressed in Bank Board Memorandum R–31a, which required that goodwill be amortized over a period not to exceed ten years. DX 4.

DX 43 at OAF001 2023 and DX 37 at OAF001 2106). Accounting for that merger was based on the "pooling of interests" method, DX 43 at OAF001 2022, and, given the Clinton thrift's small size, had little effect on American Federal's balance sheet.

To pursue geographic expansion more vigorously, American Federal developed plans to install new branches at targeted locations. Among other things, American Federal filed an application with the Bank Board for permission to establish a branch in Spartanburg, an area served by Bell Federal. Stip. ¶ 31. Although four savings and loans in the Spartanburg market promptly filed written protests to American Federal's application, Stip. ¶ 33; DX 26, it was approved in early December 1980. Stip. ¶ 34. American Federal thereafter developed extensive plans to expand into other areas of the Piedmont crescent through installation of new branches, DX 2005A (growth plan presented to American Federal's Board of directors at a meeting on June 11, 1981); Tr. 362–74 (Bolt testimony), on a phased approach as it might be able to generate capital to fund the expansion. The proposed growth plan included cost estimates for building the projected new branches. DX 2005A at 1407. Generally, American Federal's advertising encompassed the area covered by the growth plan, offering the prospect of marketing efficiencies, Tr. 190–91, 375 (Bolt testimony), and the area was an attractive one for expansion: "the Piedmont area has experienced rapid growth in population and income during the past 10 years, and this should continue during the next 10 years." DX 2005A at 1406.

During 1981, however, American Federal's own financial condition was weakening because of adverse interest rate margins. DX 3002 at OAF001 4748–50 (Bank Board 1981 examination report for American Federal); PX 312 at 4 (American Federal's average cost of money was 10.59% as of August 31, 1981, and its average portfolio yield was 9.72% as of the same date); Tr. 203 (Bolt's testimony that "everybody's net worth was being eaten up by losses."). Establishing new, "stick built" branches thus was difficult for American Federal. Moreover, mergers accomplished by means of a pooling of interests were made even more problematic because the smaller thrifts in the area that were candidates for acquisition were weakening even more rapidly than American Federal because of their larger negative interest rate spreads between loan assets and deposit liabilities.

With the advent of Memorandum R–31b, American Federal had a means to circumvent the impediments to its expansion. By invoking the policies set out in Memorandum R–31b, American Federal could find advantages in mergers with weak thrift institutions in its targeted geographic market area. The purchase method of accounting would require a marking of the assets of acquired thrifts to market, generating paper losses measured against face value. Those losses would be counted as goodwill, an intangible asset that would be amortized over an extended period and serve as regulatory capital until amortized. In effect, by merging with smaller, troubled thrifts in the targeted area, American Federal could enhance the efficiency of its operations, provide a base for future growth, and improve its own regulatory balance sheet. *See* Tr. 729–31 (testimony of George Campbell, American Federal's chief financial officer, that he considered the policy change to represent "manna from heaven"); Tr. 213–14 (Bolt's testimony that when Campbell told him of the new policy, Bolt considered it "incredible").[5]

The Federal Home Loan Bank of Atlanta ("FHLB–Atlanta") had sent American Federal a copy of Memorandum R–31b on September 4, 1981, three days after it had been issued by the Bank Board. American Federal immediately pursued the opportunity presented by Memorandum R–31b. Just over a month after receiving Memorandum R–31b, American Federal submitted its first merger application to FHLB–Atlanta. PX 104 (Unit-

---

5. American Federal's mergers were undertaken not only as a means of "expanding market territory" but also "to improve profitability through the sale of acquired loans. Moreover, yields were increased on interest earning assets through the use of purchase accounting, and operational economies of scale were made possible." *See* Stip. ¶ 44 (quoting DX 383 at 4); PX 76 at 11.

ed application (Oct. 8, 1981)). Mr. Bolt talked with United's president, Stanley Johnson, on August 26, 1981. Mr. Johnson stated that United's board "still did not want to merge" but that he was in favor of a merger and would leave United if the board refused to discuss a merger. Stip. ¶ 47. United appointed a merger committee on September 1, 1981, and a group of American Federal's officers and directors met with the United committee the next day. Stip. ¶¶ 48–49. United's committee also met with two other potential acquirors, Security Federal Savings and Loan Association of Columbia, South Carolina, and South Carolina Federal. Stip. ¶ 51. On September 8, 1981, United's committee reported to United's board about the discussions, and the board approved a proposal that United merge with American Federal. Stip. ¶ 52. American Federal's approval soon followed, a merger agreement was signed on October 1, 1981, PX 104, and the merger application was submitted to the Bank Board on October 8, 1981. *Id.* The application shows that American Federal and United were in a roughly comparable financial condition at the time. Tr. 1738 (testimony by Robert J. Cohrs, a supervisory agent with the FHLB–Atlanta, with responsibility for examination and oversight in several states, including South Carolina). At approximately the time of the merger application, United's net worth was $2.25 million on a regulatory book-value basis, or 4.6% of its assets, Tr. 1814, but its projected unrealized loss on its loans on a mark-to-market basis was $9,571,000. PX 104 at PAF001 0084. American Federal's net regulatory book value at the time was $15.488 million, or 4.4% of its assets. Tr. 1814–15. On direct examination, Mr. Cohrs testified that at the rate United was losing money at the time of the merger application, United had 4.6 years remaining to insolvency, but on cross-examination he revised that projection downward to "19 months." *Compare* Tr. 1814–15, *with* Tr. 1961. In addition, both United and American Federal were aware that American Federal had significant advantages in the marketplace because of its substantial investment in developing new financial products, its advertising and other marketing efforts, and its more advanced technology. Tr. 1964

(Cohrs's testimony that American Federal's size and sophistication of management permitted it to offer more commercial products and services than the four acquired thrifts).

The United application was followed by three further applications for approval of mergers over the next several months. PX 097 (Home application (Nov. 2, 1981)); PX 120 (Family application (Mar. 3, 1982)); PX 057 (Bell application (Mar. 23, 1982)).

Home had been in merger discussions with First Carolina Savings and Loan Association of Columbia, South Carolina as well as Security Federal Savings and Loan Association of Columbia, South Carolina, and it had also favored exploring a merger with Greenwood Savings and Loan Association. Stip. ¶¶ 63–64. However, Mr. Bolt of American Federal sought and obtained a meeting with Patrick Foster, president of Home, on or about September 10, 1981, to discuss a merger. DX 150 at 2; Stip. ¶ 65. Discussions progressed rapidly. On September 28, 1981, Home's board met and considered competing merger offers from Security Federal and American Federal, and it chose American Federal. A merger agreement was executed on October 12, 1981, PX 97, and an application to merge was filed with the Bank Board on November 2, 1981. *Id.* Home also was in a roughly comparable financial position to American Federal. Home had a regulatory net worth of approximately $5.1 million, 4.17% of its assets, but its projected mark-to-market deficit on its loans was $30,682,642. *Id.* Mr. Cohrs testified on direct examination that Home had 14 years remaining to insolvency, given its rate of operating losses, but on cross-examination he revised that number downward to "about 2.6 years, 2.8 years." *Compare* Tr. 1819–20, *with* Tr. 1956. Just prior to the merger agreement, Home was losing about $150,000 per month. Tr. 1955.

American Federal's merger discussions with Family Federal of Greer, South Carolina, proceeded on a somewhat different path. Family Federal's financial position was becoming sufficiently precarious that its board had been advised by two supervisory agents of the FHLB–Atlanta, Mr. Cohrs and

Robert S. Warwick, that Family should promptly seek a merger partner. DX 203.[6]

In November 1981, Family Federal's Executive Committee began negotiations with officials of Bell Federal. Stip. ¶ 82. Another thrift, Standard Federal, also instituted discussions with Family. However, Family's Executive Committee was informed in early February 1982 that "Bell is now talking with American Federal and appears to be taking a step back from merger talks with Family Federal." Id. Family's representatives then met with Mr. Bolt and others with American Federal, and a merger agreement rapidly emerged, was approved by both boards, and was submitted for approval. Stip. ¶¶ 86–92. The merger was treated as "supervisory" because Family was at the very brink of insolvency, being barely solvent on a regulatory-capital basis and significantly insolvent on a mark-to-market basis at the time of the application. Stip. ¶¶ 94, 97.[7]

American Federal had delayed renewing its merger discussions with Bell Federal during its negotiations with United and Home. Stip. ¶ 101. In addition, Mr. Bolt had reported to American Federal's board on October 20, 1981, that American Federal was delaying construction of a new branch in Spartanburg, where Bell Federal was located, "until some decisions had been reached with regard to merging in the Spartanburg area." DX 2009 at PAF003 1499. A meeting between officials of American Federal and Bell did take place on October 28, 1981, Stip. ¶ 103; DX 177, and American Federal became aware

that Bell had been having merger negotiations with South Carolina Federal and Security Federal, id., in addition to First Federal of Greenville. Tr. 411 (Bolt testimony).[8] After discussions over several months, American Federal made a merger offer to Bell on February 17, 1982, PX 58, and the merger was thereafter negotiated and approved by both boards. An application for approval of the merger with Bell was filed on March 23, 1982. PX 57. Bell and American Federal were in a comparable financial condition at the time. Bell had a regulatory net worth of approximately $2.47 million, about 3.8% of its assets. Tr. 1810. Bell was losing money at a rate of about $98,000 a month. Tr. 1963. On a projected mark-to-market basis, Bell had a deficit of $17,277,228. PX 57 at PAF001 0507.

All four applications stated explicitly that the proposed mergers would be accounted for using the purchase method of accounting in accordance with Memorandum R–31b. PX 104 at PAF001 0081; PX 097 at PAF001 0232; PX 120 at PAF001 0365; PX 057 at OAF001 0459. In addition, the United and Home applications contained calculation tables showing amortization of goodwill resulting from the mergers over a forty-year period, PX 104 at PAF001 0144; PX 097 at PAF001 0234, and the Family and Bell applications expressly requested that goodwill be amortized over "40 years, and not an arbitrary shorter period." PX 120 at PAF001 0406; see PX 057 OAF001 0493. See also PX 097 at 95–498C 0237 (identical language in

---

6. A meeting between officials of FHLB–Atlanta and Family occurred on February 9, 1982, after Family had already begun merger discussions with several thrifts. At the meeting, Mr. Cohrs presented Family's board with two resolutions to consider. DX 203 at 1. The board unanimously passed the "short-form resolution authorizing [FHLB–Atlanta] to release information [regarding Family Federal] to potential merger candidates." Id. With respect to "the FSLIC long-form resolution," which provided the Bank Board with the power to merge Family Federal into another institution, the board "requested an additional 30 days to attempt to negotiate a voluntary merger on their own." Id. Messrs. Cohrs and Warwick consented, provided that the board agree to adopt the long-form resolution at its regular meeting on March 9, 1982, in the event it had failed to negotiate a merger agreement by that time. Id.

7. FHLB–Atlanta originally took the position that the Family merger could not be approved under delegated authority because of a combined market share of 27.7% that American Federal would obtain as a result of the merger. PX 180. On April 15, 1982, the Bank Board expanded the delegated authority of PSAs, which allowed the Family Federal merger to be approved by FHLB–Atlanta. Stip. ¶ 95. On May 3, 1982, the Family Federal application was returned to FHLB–Atlanta for processing. Id.

8. First Federal of Greenville was American Federal's strongest and most direct competitor in the Piedmont crescent area. Tr. 428–31, 433–35 (Bolt testimony).

response by American Federal's accountants dated February 16, 1982, to an inquiry about accounting by an official with FHLB–Atlanta respecting the proposed merger with Home).

The supervisory agent of FHLB–Atlanta who was responsible for evaluating the transactions from a supervisory standpoint, Mr. Cohrs, recommended that each of American Federal's four merger applications be approved and in doing so reported to the Bank Board that American Federal was proposing that the resulting goodwill be amortized over an explicit forty-year period. DX 140 at OAF001 1787 (United); DX 151 at OAF001 1532 (Home); PX 161 at OPF001 1727 (Family); PX 167 at OPF001 1372 (Bell).

Mr. Cohrs raised questions about the accounting treatment proposed by American Federal. PX 310; Tr. 1768–69. In connection with the application to merge with Home, on December 14, 1981, he informed American Federal that it had not adequately substantiated its plan to use purchase accounting and requested that American Federal's outside accountants provide additional information. PX 310.[9] Mr. Cohrs explained that "the Chief Accountant's Section of the Office of Examinations and Supervision will be reviewing the explanation with regard to the purchase accounting procedures" and would require more information. *Id.* at 1. This inquiry on the part of Mr. Cohrs reflected the role of the office of the chief accountant for the Bank Board in merger applications. The Chief Accountant at the time, Robert Joe Moore, testified that his office had the responsibility "[t]o review the accounting that was contained in the merger applications." Tr. 1623. In that connection, his office would make recommendations regarding accounting treatment. *Id.*

The office of the chief accountant of the Bank Board, and the Chief Accountant himself, became involved in the merger applications for both Home and United with American Federal. Mark Rundle, Regional Director, Office of Examinations and Supervision of the Bank Board, forwarded the two merger applications to the Chief Accountant on January 7, 1982, for an opinion whether the accounting proposed in the applications was appropriate. PX 220. In response, Mr. Moore said that he did "not have adequate information on which to base any conclusion as to the appropriateness of the method of accounting used and the application of the method." *Id.* On February 25, 1982, Mr. Rundle then forwarded to Mr. Moore the additional information that American Federal's accountants had provided in response to Mr. Cohrs's request. *Id. See also* PX 115 (letter forwarding response by American Federal's accountants regarding the initial merger); DX 187 (response by American Federal's accountants regarding the Home merger); Tr. 1770–72 (Cohrs testimony).[10] After review, Mr. Moore concurred that use of the purchase method of accounting was appropriate but identified deficiencies in the submission by American Federal's accountants:

> The Coopers and Lybrand letter of February 16 identifies and quantifies intangible assets to be acquired through American [Federal]'s acquisition of Home FS & LA. However, these identifiable intangible assets were not shown in projections by the applicant. *The amortization period (40 years) shown by the applicant is inconsistent with the February 16 letter.* Also, we noted no attempt to identify intangibles or support a 40 year amortization of goodwill by American relating to its acquisition of United FS & LA.

9. American Federal had supported the proposed use of the purchase method of accounting in its application by stating its intent to dispose of a substantial portion of Home's assets following the merger. Stip. ¶ 70. Mr. Cohrs did not question this aspect of American Federal's proposed accounting treatment.

This justification for use of purchase accounting was repeated for each of the other merger applications at issue. *See, e.g.,* Stip. ¶ 108.

10. The additional information forwarded by Mr. Rundle related only to the Home application even though both the United and Home applications were under review by the Bank Board staff insofar as the proposed accounting treatment was concerned. Tr. 1770–72. American Federal had been asked by Mr. Cohrs to provide additional information only with respect to the proposed Home transaction, although American Federal also provided supplementary information regarding the United transaction.

PX 221 at 1 (emphasis added). In the circumstances, Mr. Moore recommended that any approval of the proposed merger should be conditioned in part upon the following:

> American FS & LA shall furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision which (a) specifically describe, as of the Effective Date, any intangible assets including goodwill, or discount of assets arising from the merger to be recorded on American FS & LA's books, and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill,' and the discount of assets and the related periods and methods.

*Id.* at 2.

Based upon the evidence at trial, at the application stage, neither the Bank Board, nor its staff, including the Chief Accountant, nor FHLB–Atlanta gave any further consideration to the amortization period for goodwill to be allowed in the proposed United and Home mergers. The Bank Board did not make additional inquiries about the justification for use of a forty-year amortization period even though, in the Chief Accountant's opinion, American Federal had not established that a forty-year period was appropriate under Generally Accepted Accounting Principles ("GAAP"). In the same vein, the Bank Board did not endeavor to reduce the allowable amortization period to a span of years less than forty. The Bank Board simply accepted American Federal's proposed accounting, subject to the condition recommended by the Chief Accountant.

On April 1, 1982, the Bank Board issued resolutions conditionally approving the United and Home mergers. PX 094 (Resolution No. 82–226 approving the United merger); PX 093 (Resolution No. 82–227 approving the Home merger). Shortly thereafter, the Bank Board's delegatee, the Principal Supervisory Agent ("PSA") of FHLB–Atlanta, Carl O. Kamp, Jr., issued a letter conditionally approving the Bell merger on April 23, 1982, and a letter conditionally approving the Family merger on May 7, 1982. PX 092; PX 095. Approval for each of the four mergers was conditioned on the submission of analyses and a concurring opinion from an independent accountant describing the amount of goodwill arising from each merger and substantiating the reasonableness of that amount and its amortization period.[11]

As satisfaction of those conditions, American Federal submitted documentation justifying use of the purchase method of accounting and amortization of resulting goodwill over a forty-year period. DX 287 at OAF001 1946 (United); PX 142 at AF042 0899–900 (Home); DX 300 at OAF001 1735 (Family); DX 299 at OAF001 1760 (Bell). By internal memoranda and letters to the president of American Federal, the Bank Board confirmed that those submissions fulfilled the conditions to approval of each transaction. DX 310; PX 143; PX 282; PX 286; DX 318; PX 244; Tr. 2130–33. Through these transactions American Federal booked approximately $61 million in goodwill. Stip. ¶ 117.[12] Thereafter, from 1982 until October 1988, the thrift amortized the goodwill generated by these transactions according to the forty-year schedule. Stip. ¶ 118. Throughout this period, American Federal also treated the

---

11. *E.g.*, Condition 2 in Bank Board Resolution No. 82–226 regarding the United merger provided:

> That American Federal Savings and Loan Association shall furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision which (a) specifically describe, as of the Effective Date of the merger, any intangible assets including goodwill, or discount of assets arising from the merger to be recorded on American FS & LA's books, and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill,

> and the discount of assets and the related periods and methods.

PX 094 at AF001 0152–53. This condition repeated verbatim the language that had been recommended by Mr. Moore, the Bank Board's Chief Accountant.

12. After the mergers, American Federal's total net worth was only about $23 million, PX 67 (audited financial statement for American Federal as of December 31, 1982), apart from the regulatory capital represented by the goodwill. Thus, it would have been severely insolvent on a regulatory-net-worth basis but for the goodwill.

unamortized portion of the goodwill as an element of American Federal's regulatory net worth or regulatory capital. Stip. ¶ 119.

The problems that arose in the thrift industry during the early 1980s worsened in the latter part of that decade. Tr. 1267–68. By the mid–1980s, American Federal fell out of compliance with its regulatory capital requirements. Tr. 533, 603; DX 515 at AF4001 2146. With the encouragement of FHLB–Atlanta, American Federal began planning to raise capital by way of a modified conversion from mutual to stock ownership. Tr. 542–43, 996–97; DX 439; DX 448 at FL WOL746 0705–06; DX 471 at WOL747 2182; DX 510.[13]

On September 6, 1988, American Federal submitted to the Bank Board an application for such a modified conversion. PX 332; PX 333; DX 515; Tr. 547–48. As American Federal's Chief Financial Officer at the time, Michael Trimble, testified: "[t]he most significant issue that the [Bank Board]'s accounting group had with our offering document, our application, was surrounding goodwill." Tr. 546. The application specified American Federal's intent to continue amortizing its goodwill on a forty-year schedule. PX 333 at AF23 01131–32; Tr. 546–49, 620. In response, the Bank Board indicated that it would condition its approval on American Federal's reduction of the amortization period to a total life of twenty-five years to be applied retroactively to the dates of the mergers. PX 334; Tr. 546–54, 561–62, 618–20. That would have required American Federal to take an immediate charge of approximately $6 million to cover the retroactive adjustment of a more accelerated amortization of goodwill. Tr. 550 (Trimble testimony). The parties thereafter negotiated about the amortization period and ultimately reached a compromise whereby the Bank Board approved an amortization period of 23.25 years to be applied prospectively from the date of conversion, for a total life of approximately 29.5 years. Tr. 561–64, 574, 639, 999. American Federal accordingly revised its conversion application materials, including its Offering Circular, to reflect the terms to which the parties had agreed. PX 337 at AF54 01348–49; Tr. 577–78; DX 533. On November 10, 1988, the Bank Board, through its delegatee, Mr. J. Larry Fleck, the General Counsel of Corporate and Securities Division, approved American Federal's conversion application, DX 534 (approval of conversion application), and American Federal subsequently implemented the conversion. Tr. 701 (effective date of January 26, 1989 for the offering).

Concurrently with the conversion, American Federal sought approval from the Bank Board to include as regulatory capital $0.1 million from the issuance of Series A Subordinated Debentures and $13.5 million from the issuance of Series B Subordinated Debentures. That application was approved by

---

**13.** A modified conversion is limited to institutions that are out of capital compliance. Tr. 607. In a standard stock conversion, "a mutual savings and loan association changes its form of ownership from a mutual to a stock institution, and in doing so, sells 100 percent of its value—or offers it to the public"—through a direct community offering or public offering, or both, giving priority to subscribing eligible account holders, or supplemental subscribing account holders, or tax-qualified employee stock benefit plans. Tr. 2151–52 (testimony of J. Larry Fleck, the official at the Bank Board who was responsible for receiving proposed conversions in 1988 and thereafter at the Office of Thrift Supervision); *see also* 12 C.F.R. § 563b.3(c) (1988). In a modified conversion, the amount raised would be in excess of the estimated *pro forma* market value, such that the institution would be viable after the conversion. Tr. 2153–54 (Fleck testimony). The Bank Board's regulations included the following defining provision:

A modified conversion generally is available to an institution that fails to meet its regulatory capital requirement. In a modified conversion, the substantive and procedural rights granted to members in mutual insured institutions converting under Subpart A may be restricted in order to meet the needs of an insured institution whose financial condition has deteriorated such that a standard conversion which would raise sufficient capital to enable the institution to achieve a solid capital base is not feasible. Modified conversions may be effected without the approval of members, must involve sales of conversion stock at an aggregate price in excess of the *pro forma* market value of the institution as determined by an independent appraiser, and involve the limitation of members' preemptive rights.

12 C.F.R. § 563b.35 (1988).

Robert Showfety, then the PSA, FHLB–Atlanta, on December 23, 1988. DX 545.

With the enactment August 9, 1989, of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464), the use of goodwill as part of regulatory capital was eliminated, and the use of subordinated debt was barred from core capital. The Office of Thrift Supervision ("OTS"), the successor to the Bank Board under FIRREA, promulgated interim regulations implementing FIRREA's new capital requirements on November 8, 1989, to be effective December 7, 1989. 54 Fed.Reg. 46,845 (Nov. 8, 1989). With the elimination of goodwill from its capital and the curtailment of subordinated debt as capital, American Federal fell out of compliance with the new capital requirements. Stip. ¶ 120. In March 1990, J. Laurence Sykes, a supervisory agent with OTS, analyzed whether, given American Federal's lack of compliance, it was appropriate to transfer American Federal to the Resolution Trust Corporation ("RTC"). Stip. ¶ 120. In a memorandum dated March 5, 1990, Mr. Sykes recommended against transferring American Federal to the RTC. Stip. ¶ 122. In making this recommendation, he took into account that the four institutions acquired by American Federal in the Spring of 1982 "were either insolvent or considered to be of supervisory concern" at the time of their acquisition. *Id.* American Federal thus continued in operation, and, in due course, it brought the instant action seeking damages for breach of alleged contracts respecting treatment of goodwill and subordinated debt as regulatory capital.

## ANALYSIS

### A. Formation Of Contracts In Connection With The 1982 Mergers

■ The various interactive exchanges between the government and American Federal "constitute a contract only if three elements are met: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *La Van v. United States*, 382 F.3d 1340, 1346, 2004 WL 1949853, at *4 (Fed.Cir.2004) (internal quotation marks and citations omitted). These elements are shared by both express and implied-in-fact contracts, but "an implied-in-fact contract is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.* (internal quotation marks and citations omitted). As previously determined, mutuality of intent is the only element of contract formation at issue with respect to the 1982 mergers. *See American Fed.*, 58 Fed.Cl. at 436 (holding that the PSA of FHLB–Atlanta had implied actual authority to bind the government with respect to the Family and Bell acquisitions); *id.* at 445 (concluding that there was no genuine dispute that consideration existed).

### 1. *Mutuality of intent to contract.*

■ To satisfy its burden to prove mutual intent to contract, a plaintiff must proffer objective evidence demonstrating the existence of an offer and a reciprocal acceptance. *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed.Cir.2003) (citing *Estate of Bogley v. United States*, 206 Ct.Cl. 695, 514 F.2d 1027, 1032 (1975); *Restatement (Second) of Contracts* § 22(1) (1981)).

### (a.) *Offer.*

■ "[A]n offer is made by 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " *Id.* (quoting *Restatement (Second) of Contracts* § 24; citing Richard A. Lord, *Williston on Contracts* § 4:13, at 367 (4th ed.1990)). The court finds that American Federal made an offer to the government that American Federal would bear the marked-to-market deficit resulting from an excess of liabilities over assets for each of the four thrifts in exchange for the ability to amortize the resulting goodwill over a period of forty years and to count that goodwill as part of its regulatory capital.

The government explicitly invited offers of the type made by American Federal to the

Bank Board. Thurman C. Connell, who in 1981 and 1982 was vice president of FHLB–Atlanta and responsible for both the supervisory department and the applications department, Tr. 1257, testified at trial that the Bank Board was "essentially ... out selling a product[,] ... [namely, the] ability to be able to treat the goodwill as an asset and to be able to amortize it over a 40–year period of time.... It really was an inducement to help the industry consolidate." Tr. 1323–24. H. Brent Beesley, former director of FSLIC, testified that "mergers were probably the most common approach that [was] used in those days, and in addition [they were] a very important part of our program." Tr. 78. *See also* Tr. 88–89, 131. Where "advertising and promoting of a product" are not sufficiently definite to constitute contractual offers, they may instead be "an invitation for offers, while responding to such an invitation may itself be an offer." *Linear Tech. Corp. v. Micrel, Inc.,* 275 F.3d 1040, 1051 (Fed.Cir. 2001) (quoting *Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1048 (Fed.Cir. 2001)). *See also Mesaros v. United States,* 845 F.2d 1576, 1580–81 (Fed.Cir.1988). That is essentially what happened here.

Mr. Connell distributed a copy of Memorandum R–31b to all of the member thrifts of FHLB–Atlanta. Tr. 1280. In addition, Bank Board officials communicated the policy outlined in Memorandum R–31b through speaking engagements at industry trade organization meetings. Tr. 79–80, 1272, 1276–78. George Campbell, the Senior Vice President and Chief Financial Officer of American Federal at the time of its four acquisitions at issue here, obtained word of that memorandum before it was issued by the Bank Board. Tr. 731.

American Federal's responses to the government's invitation, manifested through the four merger applications, are sufficiently definite to constitute contractual offers. Each application expressly stated that the purchase method of accounting would be used in accord with Memorandum R–31b and proposed that the resultant goodwill be amortized over a period of forty years. PX 104 at PAF001 0081, 0144 (United); PX 97 at 95–498C 0221, 0237 (Home); PX 120 at PAF001 0365, 0406 (Family); PX 57 at OAF001 0459, 0493 (Bell). Additionally, in three of the four application materials, American Federal emphasized that it would not amortize the goodwill over some "arbitrary shorter period." PX 097 at 95–498C 0237; PX 120 at PAF001 0406; PX 057 at OAF001 0493.

In response, the government posits that American Federal's applications cannot constitute contractual offers because the applications merely complied with regulations and published policy. Def.'s Post–Trial Br. at 49; Def.'s Post–Trial Resp. at 2–3 ("there was no objective manifestation of any intent to bargain for anything beyond approval in accordance with the regulatory requirements"). The Federal Circuit rejected this argument more than nine years ago in *Winstar Corp. v. United States,* 64 F.3d 1531 (1995) ("*Winstar II*"), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*"). In holding that a contract existed pursuant to which an acquiring thrift, Glendale, could amortize goodwill over forty years, the Court of Appeals considered "the government's argument that the Bank Board Resolution was merely a statement of 'then-current prosecutorial and regulatory policy' to be of little significance." *Winstar II,* 64 F.3d at 1542. *Accord First Fed. Lincoln Bank v. United States,* 60 Fed.Cl. 501, 506 (2004) ("[D]efendant's contention that no contract existed because the contract terms regarding goodwill amortization conformed with existing regulatory policy is without merit."). As the Federal Circuit explained, the key factors in determining whether statements consistent with regulatory policy evince contractual significance is whether "*specific terms* as to the amount of supervisory goodwill and its amortization periods under that regulatory policy were incorporated in a negotiated arm's length contract." *Winstar II,* 64 F.3d at 1542 (emphasis added).

The specificity of terms contained in American Federal's four merger applications bears close correspondence to the application materials involved in *Anderson,* in which the Federal Circuit concluded that use of explicit terms constituted an offer. In that case, the Court of Appeals found that The Westport Company ("Westport") manifested an offer

through its application to acquire Dade County Savings and Loan Association ("Dade"), subsequent amendments to that application, and letters provided by Westport's and Dade's accountants. *Anderson,* 344 F.3d at 1353. In a letter to the Bank Board included as part of a second amendment to its application, Westport proposed that the purchase method of accounting be used and that the resulting goodwill "be amortized by use of the straight-line method over a period of 40 years, the maximum permitted under generally accepted accounting principles." *Id.* at 1354. In a final letter, Westport modified the amortization period requested to twenty-five years. *Id.* Given these circumstances, the court deemed it "clear that, in exchange for acquiring the financially ailing Dade, Westport wanted the Bank Board's promise to allow straight-line amortization of regulatory goodwill over an extended period. In other words, this particular accounting treatment for supervisory amortization of goodwill was a condition of Westport's offer." *Id.*

In this respect, American Federal's merger applications are distinguishable from the transactional documents involved in *D & N Bank v. United States,* 331 F.3d 1374 (Fed. Cir.2003). In finding that no offer was made to the government in that case, the Federal Circuit observed that "none of the documents proffered by D & N mentions goodwill or the accounting treatment thereof," *id.* at 1378, and "the application for merger, which was lengthy and had many attachments, contained no specific reference to a commitment for long-term amortization." *Id.* at 1376. Here, however, American Federal explicitly sought a commitment for a forty-year amortization period. *See supra,* at 195.

The government also questions American Federal's motivation for the mergers and denies that the mergers were promoted by the Bank Board. During the trial, the government spent considerable time adducing testimony that three of the four thrifts acquired by American Federal, United, Home, and Bell, were roughly at parity with American Federal insofar as their regulatory capital position was concerned. Only Family was actually a failing institution, and only the

Family merger was considered by the Bank Board and FHLB–Atlanta to be a "supervisory" merger. The other institutions were losing money steadily because of their negative interest-rate spreads, but they were not yet insolvent. The government also adduced considerable testimony that American Federal had ambitious plans for geographic expansion in the Piedmont crescent area, to build a financial institution capable of competing effectively with banks and with its fierce competitor, First Federal of Greenville. These circumstances, however, do nothing to denigrate the nature of the offers made by American Federal to the Bank Board and FHLB–Atlanta. As both Mr. Bolt and Mr. Campbell, the senior officials of American Federal at the time, testified, they viewed the policy enshrined in Memorandum R–31b as "manna from heaven" and an "incredible" opportunity, *see supra,* at 188 (quoting Tr. 729–31 and Tr. 213–14), and they sought to make the most of it. By doing so, American Federal could enhance the efficiency of its own operations, provide a base for future growth, and improve its own deteriorating balance sheet on a regulatory capital basis. That the offers made by American Federal to the Bank Board had a sound foundation in American Federal's business purposes does nothing to call into question the validity of the offers themselves.

In short, American Federal made offers to the government to acquire each of the four thrifts in exchange for the ability to use the purchase method of accounting, to count the goodwill generated toward its net worth requirements, and to amortize the goodwill over a period of forty years.

(b.) *Acceptance.*

"For a contract to be formed once an offer is made, there must be an acceptance, i.e., a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Anderson,* 344 F.3d at 1355 (quoting *Restatement (Second) of Contracts* § 50(1)). In *D & N Bank,* the Court of Appeals noted that the Bank Board's "mere approval of the merger" did not create a contractual obligation. 331 F.3d at 1378–79. As the court observed, "[s]omething more is necessary." *Id.* at 1379. As

the court further elaborated in *Anderson,* "[t]hat 'something more' must be, according to our precedent, a 'manifest assent to the same bargain proposed by the offer.' " 344 F.3d at 1356 (quoting *Restatement (Second) of Contracts* § 50 cmt. a). "Perhaps, the Court of Claims best captured this requirement for 'something more' when it explained that, to create a contract, '[t]he offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly.' " *Id.* at 1357 (quoting *Estate of Bogley,* 514 F.2d at 1032). The Federal Circuit in *Anderson* found that a regulatory condition in a Bank Board Resolution requiring that an acquirer submit analyses and a concurring accountant's opinion detailing its treatment of resulting goodwill was "nothing more than regulatory boilerplate, added by the Bank Board as a regulator rather than as a contractor." 344 F.3d at 1357. *Accord D & N Bank,* 331 F.3d at 1378–79. The conditions in *Anderson* and *D & N Bank* bear significant similarities to the conditions contained in each of the government's conditional approvals of American Federal's mergers, even though the conditions in American Federal's instances reflected Chief Accountant Moore's particular recommended variation of the language. *See supra,* at 192. American Federal does not rely on those conditions as manifesting an acceptance by themselves, but American Federal does put those conditions forward as part of the circumstances that show the Bank Board's assent to each of American Federal's offers. Pl.'s Post–Trial Br. at 21–25; Pl.'s Resp. at 7–14.

In *La Van,* the Federal Circuit recently affirmed a trial court's holding that a plaintiff mutual savings and loan association entered into a contract implied in fact with the government concerning the treatment of goodwill generated in connection with the plaintiff's conversion to a federally chartered stock company. The court in that case found contractual significance both in the Bank Board Resolution approving the use of pushdown accounting and amortization of goodwill "over a period not to exceed 35 years" as well as in the principal supervisory agent's recommendation of approval in an internal memorandum sent to the Bank Board's regional director. *La Van,* 382 F.3d at 1344, 2004 WL 1949853 at *3. The latter document evidenced that "the treatment of goodwill was at the epicenter of the conversion process." *Id.* at 1346, 2004 WL 1949853 at *5. In particular, in confirming the arm's length nature of the transaction, the memorandum referenced negotiations between the parties and specified that " '[t]he purchasers are requesting a 35–year write-off period for the goodwill that arises in the transaction.' " *Id.* As the Court of Appeals observed, "[t]hat memorandum clearly reflects the 'something more,' that is, the recognition that the government was engaged in negotiations about the terms of the conversion as well as the subsequent manifest assent to abide by the Resolution required under *D & N Bank.*" *Id.*

In finding the "something more" in the documents at hand in the *La Van* case, the Federal Circuit fleshed out the commentary in *Anderson* and *D & N Bank.* In addition, in *First Federal Lincoln Bank v. United States,* 60 Fed.Cl. 501 (2004), the court recently found the existence of a contract between a thrift and the government in connection with a merger where the resolution approving the merger contained only regulatory boilerplate language. The court determined that "the negotiations and circumstances leading up to approval of the merger gave that same regulatory boilerplate language a contractual meaning," *id.* at 506, and based its finding on testimonial and documentary evidence of "extensive negotiations that specifically addressed the issues of goodwill amortization and purchase accounting." *Id.* at 505. *See also First Fed. Lincoln Bank v. United States,* 58 Fed.Cl. 363, 367–69 (2003).[14]

---

14. The court in *First Federal Lincoln Bank* discerned the following analytical framework:

> determining whether the "manifest assent" necessary to form a contract exists involves a two-step inquiry. First, a court should look to documents such as FHLBB resolutions, forbearance letters, assistance agreements, and supervisory action agreements to see if they consist of only regulatory proclamations, or if they include additional language, which clearly manifests the government's intention to contract. *Anderson,* 344 F.3d at 1356–57. Sec-

198

As the *Restatement (Second) of Contracts* would have it, "[a]cceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Id.* § 50(1). In this vein, as the *Restatement* notes, "[t]he promise may be made in words or other symbols of assent, or it may be implied from conduct, other than acts of performance, provided only that it is in a form invited or required by the offer." *Id.* § 50 cmt. c. Although "[i]t is not enough that the words of a reply justify a probable inference of assent ... [,] the circumstances may make it proper to protect an offeror who acts on such an inference. Or subsequent conduct of one or both parties may bind one to an agreement in accordance with the understanding of the other." *Id.* § 57 cmt. b. Importantly, whether an offeree's conduct "constitutes an acceptance will depend upon whether the offeror reasonably understands it to be an acceptance and whether it reasonably appears to conclude a contract or whether it leaves matters yet to be concluded." *Williston on Contracts* § 6.10, at 71. "This rule, espoused by the Restatement (Second), operates to protect the offeror who acts reasonably in relation to what he supposes is intended to operate as an acceptance, yet provides the offeror with significant flexibility as the master of his offer." *Id.* at 74.

The court in the instant case finds ample evidence of the government's manifestation of assent to the specific terms offered by American Federal. There is no question that the government understood that use of the purchase method of accounting, amortization of goodwill over exactly forty years, and inclusion of unamortized goodwill in American Federal's regulatory capital were conditions to American Federal's offers. As discussed earlier, Mr. Cohrs of FHLB–Atlanta restated those precise terms in his internal digests recommending that the Bank Board approve American Federal's merger

applications. *See supra,* at 191. Additionally, prior to granting approval of American Federal's merger with United and Home, both FHLB–Atlanta and the Bank Board in Washington focused their attention on the purchase-accounting-method and the forty-year-amortization terms and queried American Federal on those topics. *See supra,* at 190–92. Notably, the generation of goodwill as an intangible asset, its amortization over forty years on a straight-line basis, and inclusion of the unamortized goodwill in American Federal's regulatory capital were the only significant issues with American Federal's applications. Moreover, although the accounting condition placed in the merger approvals was manifestly drawn from a boilerplate provision, its particular language was crafted by the Chief Accountant specifically for these mergers after his review of American Federal's response to the Bank Board's queries, transmitted through FHLB–Atlanta. Most importantly, despite the Chief Accountant's misgivings and his protest that GAAP was not being strictly applied, the Bank Board simply accepted American Federal's proposed terms. That there were not extensive negotiations over the length of the amortization period merely reflects this reality.

In short, just as in *La Van,* where an internal memorandum recited the specific amortization period offered, here the various Bank Board's internal memoranda and accompanying interactions with American Federal respecting the specific terms of its offers and the ultimate acceptance of those terms, reflect the "something more" required to show assent by the government. *La Van,* 382 F.3d at 1346, 2004 WL 1949853 at *5.

(c.) *Satisfaction of conditions.*

As previously found, for each of the approved mergers American Federal submitted proofs in satisfaction of the conditions on completion of the mergers, including the accounting conditions. In each instance,

ond, if these documents do not contain this additional language, but merely contain provisions that are "regulatory boilerplate," a court should look to the circumstances surrounding the merger's approval to see if, in light of this evidence, the regulatory boilerplate clearly manifests the government's intention to contract.

*First Fed. Lincoln,* 60 Fed.Cl. at 503–04. The court also concluded that no contracts existed with respect to the plaintiff thrift's other two mergers, based on the factual findings that the circumstances surrounding the government's approval of those mergers did not demonstrate anything more than regulatory approval. *First Fed. Lincoln,* 58 Fed.Cl. at 369–70.

American Federal submitted its accountants' justification for use of purchase-method accounting and amortization of goodwill over a forty-year period. *See supra*, at 192. Those submissions were evaluated by staff at FHLB–Atlanta. In memoranda to the Applications Department of FHLB–Atlanta, Mr. Cohrs confirmed that each of American Federal's submissions satisfied the conditions of the respective Resolution or approval. Tr. 1757–59 (United); DX 310 (United); Tr. 1780–82 (Home); PX 143 (Home); Tr. 1803–04 (Family); DX 300 at OAF001 1737 (Family); Tr. 1826–28 (Bell); DX 318 (Bell). For three of the mergers, United, Home, and Bell, there is no evidence that the Bank Board staff in Washington had any role in evaluating these submissions. The evidence at trial shows that Mr. Rundle of the Division of Examinations and Supervision at the Bank Board received and approved only the compliance materials for the Family merger. PX 286; PX 284.

 The mergers thus were completed and American Federal booked a total of $61.3 million of goodwill, to be amortized over a forty-year period on a straight-line basis, with the unamortized amount to be counted as regulatory capital. In sum, the parties formed implied-in-fact contracts. The meeting of their minds is not explicitly set out in a single, integrated document,[15] but it is shown by the circumstances attendant to the mergers at issue.

### 2. *Contract implementation.*

For more than six years, American Federal amortized its goodwill resulting from its 1982 mergers based on the forty-year schedule to which both parties agreed. That implementation of contracts regarding goodwill changed only upon action that occurred in connection with an application in 1988 by American Federal for conversion from a mutual association to a stock company.

### B. Modification Of The Contracts And Entry Into A Substituted Contract Regarding Goodwill

 American Federal contends that it entered into a substituted contract with the Bank Board regarding goodwill in connection with approval of its application for a modified conversion to a stock company in December 1988. The government resists this claim, arguing that no contract for goodwill was entered at that time, echoing its arguments against formation of a contract regarding goodwill at the time of the 1982 merger approvals. "A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty." *Restatement (Second) of Contracts* § 279(1). Such a contract "discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty." *Id.* § 279(2). *See also Williston on Contracts* § 73:36, at 116. "A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties." *Restatement (Second) of Contracts* § 279 cmt. a.

The parties' agreement to enter into a substituted contract that discharges a prior contract requires the same elements of mutual assent and consideration required for contract formation. *Williston on Contracts* § 73:15, at 48. "An agreement to rescind or modify need not be express. Mutual assent to abandon a contract, like mutual assent to form one, may be implied from the attendant circumstances and conduct of the parties." *Id.* § 73:16, at 50.

### 1. *Mutuality of intent to contract.*

The government contends that American Federal did not seek or receive anything more than approval of its conversion application in accordance with existing regulatory requirements and policy, including SEC Staff Accounting Bulletin ("SAB") 42A.[16] Def.'s

---

15. American Federal has also argued in the alternative that it had entered into either express contracts or unilateral contracts with the government. Based on the finding that the various exchanges and interactions between American Federal and the Bank Board constituted contracts implied in fact, the court need not and

does not resolve the merits of these alternative theories.

16. That bulletin provided, in pertinent part:
 With respect to selection of the appropriate amortization period for goodwill acquired in business combinations after December 23,

Post–Trial Br. at 63–66; Def.'s Resp. at 13–18. Although the government is correct that American Federal's conversion was approved as a regulatory matter, that transaction was also "something more." *La Van*, 382 F.3d at 1346, 2004 WL 1949853 at *5.

Specifically, the documentary and testimonial evidence presented at trial proved that the parties negotiated about the time period over which American Federal's remaining goodwill would be amortized, and the circumstances of those negotiations evidence the contractual nature of the agreement resulting from the negotiations. Mr. Trimble, the Chief Financial Officer of American Federal at the time in question, testified that "[t]he most significant issue that the [Bank Board's] accounting group had with our offering document, our application, was surrounding goodwill." Tr. 546. American Federal's offer to convert was originally conditioned on permission to continue amortizing its remaining goodwill over the forty-year schedule. *See supra*, at 193. The Bank Board rejected that proposal and sought to condition its counter-offer on the reduction of the amortization schedule to a total life of twenty-five years to be applied retroactively to the dates of the mergers. *Id.* That result was unacceptable to American Federal because, among other things, it would have required American Federal to take an immediate loss of $6 million to account for the retroactive adjustment of such an accelerated amortization period. *Id.* Negotiations over goodwill thus were essential from American Federal's perspective, notwithstanding its poor bargaining posture.

Mr. Trimble testified that he instructed American Federal's outside accountant, Jerry Rexroad, to "do the best he could do for us, first of all to avoid the retroactive application, and second, to get as long a life as he could." Tr. 562. Mr. Trimble further testified that the parties at that point negotiated for an amortization period that was "better" than that offered by the government, though "worse" than American Federal's original offer. Tr. 576. Mr. Rexroad conducted the negotiations successfully, obtaining agreement on terms that satisfied the needs of both parties. Those terms were

prospective application of the adjustment in life so that there was no disturbing the amortization that had been taken in the first 6–1/2, 6–1/4 years. And we received a period of 23–1/4 years going forward, so in effect, where we had 34, we received 23–1/4; we lost 10 years plus of our amortization period. So it increased the costs on an annual basis, and it reduced our capital more quickly than it would otherwise have done.

Tr. 574. *See also supra*, at 193. American Federal amended its Offering Circular to reflect these terms, *see id.*, and the government granted its conditional approval on November 10, 1988. DX 534.

Mr. Trimble's testimony and the circumstances of the transaction "reflect[ ] the 'something more,' that is, the recognition that the government was engaged in negotiations about the terms of the conversion as well as the subsequent manifest assent to abide by the Resolution required under *D & N Bank*." *La Van*, 382 F.3d at 1347, 2004 WL 1949853 at *5. *See also First Fed. Lincoln*, 60 Fed.Cl. at 506 ("the negotiations and circumstances leading up to approval of the [transaction] gave that same regulatory boilerplate language a contractual meaning."). As the Federal Circuit specified in *D & N Bank*, what is needed is "proof of an affirmative statement of the government's intention to be bound *either* in documents *or based on witness testimony* about the words and actions of the relevant government officials." 331 F.3d at 1382 (emphasis added). *See also First Fed. Lincoln*, 60 Fed.Cl. at 504. The court finds that American Federal has carried its burden of proof through objective evidence demonstrating the parties' mutual intent to enter into a new, substituted contract for goodwill with the Bank Board in connection with the

1981, the automatic selection of a 40 year amortization period is not appropriate; therefore, a new registrant should be prepared to justify the use of a long amortization period. For business combinations initiated after September 30, 1982, the staff believes that 25 years is the maximum goodwill life that is acceptable.

DX 450 at 3.

December 1988 approval of a modified conversion application.

The government's secondary arguments aimed at negating mutuality of intent are without merit. First, the government observes that American Federal applied for a modified conversion because it needed additional capital to meet the regulatory net worth requirement, Def.'s Post–Trial Br. at 29–30; Def.'s Resp. at 14, and that American Federal sought unsuccessfully to convert throughout the 1980s. Def.'s Post–Trial Br. at 30–32; Def.'s Resp. at 14–15. However, these circumstances do not undermine the contractual significance of any agreements associated with the 1988 conversion application. If anything, American Federal's failed attempts to convert in 1986 indirectly support the contractual nature of its successful conversion in 1988. Statements made by governmental officials in connection with the failed attempt in 1986 tend to confirm the bargained nature of the 1988 approval in contrast to a result purely dictated by, or reflective of, regulatory policy. In a memorandum dated October 16, 1986 to Larry Fleck, the Associate General Counsel of the Corporate and Securities Division, Mr. Cohrs opined: "The applicant indicates that 35 years are left for amortizing this goodwill. We understand that in recent stock conversions only 25 years is being allowed for amortizing goodwill." DX 464 at WOL746 0102. This internal memorandum indicates that American Federal would have had to negotiate with the government to obtain permission to amortize its remaining goodwill for any period longer than a total of twenty-five years. That the parties in 1988 reached a compromise on a total period of 29–1/4 years for amortization of goodwill, which shortened period was not to be applied retroactively to time before the modified conversion, proves that "something more" than a mere regulatory approval was involved.

Second, the government argues that American Federal's willingness to negotiate a lesser period of amortization during its negotiations with the Bank Board in 1988 proves that the 1982 transactions lack contractual significance. Def.'s Post–Trial Br. at 64–65; Def.'s Resp. at 13–14. However, the facts do not support the inference the government would have the court draw. The evidence shows that both American Federal and the Bank Board's staff were willing to negotiate a new agreement about goodwill taking into account both the prior agreements respecting goodwill and changes in the Bank Board's policy over the intervening years. From American Federal's perspective, Mr. Trimble testified that it would have been imprudent in the extreme to refuse to negotiate a new agreement about goodwill. See Tr. 563 ("But when you're negotiating with a 2000–pound gorilla and you're a 10–pound monkey, you don't feel like you're quite on an even plane, because the Federal Home Loan Bank Board had our very existence in their hands, and we were undercapitalized."). Notwithstanding Mr. Trimble's view of the disparity in the parties' negotiating power, American Federal's position in the negotiations that ensued in 1988 was not so weak as Mr. Trimble made it seem. American Federal's financial weakness itself provided an incentive for the Bank Board's staff to pursue a compromise because, from the Bank Board's and FSLIC's perspective, it increased the desirability of an influx of capital via a modified conversion. Absent an injection of capital, American Federal had a greater likelihood of failing, accompanied by a cost to FSLIC. Moreover, the negotiation of a substituted agreement has contractual significance regarding whether agreements were entered in 1982, but with a result, and for reasoning, opposite from that urged by the government. That is, the new agreement necessarily operated to supersede the ones previously formed. In short, from the government's standpoint a new agreement was desirable to replace the prior agreements, which would not be relevant if there in fact had not been any such agreements.

Third, the government contends that American Federal's complaint in this suit, which was filed more than nine years ago, did not allege that a new contract was formed in connection with the approval of the modified conversion in 1988. Def.'s Post–Trial Br. at 65 n.7; Def.'s Resp. at 14. The pleadings do not support this contention. In a section of its complaint entitled "American Federal's Modified Conversion," American

Federal does describe the facts and circumstances attendant to that transaction. Compl. ¶¶ 26–29. Therefore, this contention also is unavailing.

## 2. *Consideration.*

The parties exchanged consideration with regard to the terms of a substituted contract for goodwill in connection with the modified conversion. American Federal received the benefit of a longer amortization period than that sought by the government, albeit a shorter period than that which it had previously. In return, the government adopted an "aggressive" approach to American Federal's application "in light of the benefits of this proposed transaction to the Bank System," *viz.*, temporary avoidance of insurance liability. DX 510 (Memorandum from Kim R. Scheurenbrand, Supervisory Agent, to Julie L. Williams, Deputy General Counsel (July 28, 1988)). *See also* DX 544 at OAF001 0077–78 (Memorandum from Kim R. Scheurenbrand to Robert E. Showfety, Principal Supervisory Agent (Dec. 20, 1988)) ("In our view, the approval of this Application and the subsequent modified conversion are in the best interests of both the institution and the FSLIC, as the proposed plan of modified conversion will allow the institution to meet its regulatory capital requirement."). The Bank Board's actions respecting American Federal's application for modified conversion were explicitly intended to provide a benefit to the Bank Board and FSLIC. *See* PX 1030 (FHLBB Res. No. 86–1156, 51 Fed.Reg. 40127, 40144 (Nov. 5, 1986)) (preamble to the Bank Board's amendment of its regulations governing mutual-to-stock conversions of insured institutions "to expedite the processing of modified conversion applications, and thereby to encourage the use of the modified conversion procedure by insured institutions as a capitalization vehicle"); Tr. 2239 (Cohrs's testimony that during 1988 and the first half of 1989, "it was desirable for the thrift industry itself and for the FSLIC to have additional capital infused into the industry, to assist financial institutions in curing their financial status"); Tr. 2178 (Fleck's testimony that the Bank Board "encouraged" capital-raising activities on the part of the insured thrift institutions between 1986 and 1989).

## 3. *Authority to bind the government.*

Finally, the government contends that the Bank Board's Office of Regulatory Policy, Oversight, and Supervision ("ORPOS") lacked authority to approve a conversion application. Def.'s Post–Trial Br. at 34. This contention entirely misses the mark. ORPOS did not as an entity act on American Federal's application—rather, the General Counsel's designee, Mr. Fleck, was the pertinent actor, and the government concedes his authority.

First, the government concedes that the Bank Board by regulation had vested its General Counsel and a designee of the General Counsel with authority. *Id.* (citing 12 C.F.R. § 563b.8(w)(2) (1988)). This concession is itself inaccurate in its underlying regulatory reference.[17] In this case, because a modified conversion rather than a standard

---

17. The regulation cited by the government pertains to delegations of authority to approve "standard" conversions from mutual to stock form, as set out in 12 C.F.R. Part 563b, Subpart A:

(w) *Delegation of authority—*

...

(2) *Approval of applications for conversion. The Corporation delegates to the General Counsel or his designee the authority to approve but not to deny applications for conversion pursuant to the standards and restrictions set forth in this Subpart A,* and to exercise any other authority to the Corporation under this Subpart A, excepting (i) the authority to waive any material provision of this Subpart A pursuant to § 563b.1(a); (ii) the authority to approve other equitable provisions in the plan of conversion under § 563b.3(d)(13); (iii) the author-

ity to approve any application for conversion in regard to which an objection has been filed pursuant to § 563b.4(b)(1); and (iv) the authority to approve an application for approval to offer to acquire or to acquire more than 10 percent of the stock of a converted insured institution under § 563b.3(i)(3) that raises a significant issue of law or policy or to deny an application submitted under that paragraph. The Board also delegates to the General Counsel or his designees, in connection with the approval of an application for conversion under this Subpart A, the authority to approve but not to deny applications for approval of security forms, charter amendments under § 563b.1 of this subchapter, and §§ 544.1, 544.5 and 555.2 of this chapter....

12 C.F.R. § 563b.8(w)(2) (1988) (emphasis added).

conversion was involved, a different regulation actually provided authority. 12 C.F.R. 563b.41(c) (1988).[18] Second, the government further admits that Mr. Fleck, the regulator who granted conditional approval of American Federal's modified conversion application, was the General Counsel's designee. Def.'s Post–Trial Br. at 34 (citing Tr. 2157–58 (Fleck's testimony)). Nonetheless, in effect, the government implicitly seems to be arguing that because staff at ORPOS negotiated the compromise over goodwill, that compromise was not binding on the government. That compromise was not effective, however, until it was implemented by the regulatory approval from the General Counsel's designee, Mr. Fleck. *See* DX 534 (Letter from Fleck to John F. Breyer granting conditional approval (Nov. 10, 1988)); *see also* DX 545 (FHLBB No. 1872 by Mr. Showfety, Principal Supervisory Agent, FHLB–Atlanta, granting conditional approval of American Federal's application to include as regulatory capital $100,000 from its issuance of Series A subordinated debentures and $13.5 million from its issuance of Series B subordinated debentures (Dec. 23, 1988)). Authority to bind the government thus has been established regarding the substituted contract.

### C. A Contract For Recognition of Subordinated Debt As Regulatory Capital

The court further finds that American Federal entered into a contract with the government to treat as regulatory capital, subordinated debentures it issued in connection with its modified conversion.

#### 1. *Mutuality of intent.*

On September 6, 1988, American Federal filed an Application to Issue Subordinated Debt Securities ("Subordinated Debt Application") in conjunction with its Application for Approval of a Modified Conversion ("Modified Conversion Application"). PX 332; PX 333; DX 515; Tr. 547–48. The government contends that American Federal sought and obtained nothing more than approval to issue subordinated debt securities in accordance with existing regulations. This position was not borne out by the evidence presented at trial.

The terms contained in the Subordinated Debt Application are explicit and constitute a contractual offer. The government's manifestation of assent to those terms is contained in its conditional approval of the Modified Conversion Application as well as the Subordinated Debt Application. In his conditional approval of American Federal's Modified Conversion Application, Mr. Fleck stated in relevant part:

> Immediately following the sale of the capital stock pursuant to the conversion a subordinated debenture convertible into capital stock of American Federal will be sold to the underwriter for the proposed conversion capital stock offering for an amount which, when aggregated with the proceeds from the sale of the capital stock, will total $22 million.

DX 534 at PAF081 1622 F (Nov. 10, 1988).[19] Moreover, as in *La Van,* internal memoranda demonstrate that the treatment of the subordinated debt "was at the epicenter of the conversion process." 382 F.3d at 1346–47, 2004 WL 1949853 at *5. In a memorandum to Mr. Fleck dated October 3, 1988, Kim R. Scheurenbrand, Supervisory Agent, reported in pertinent part:

> As summarized in the Plan of Modified Conversion most recently amended by the board of directors July 21, 1988, the conversion will be completed through the issuance of common stock, Series A Debentures, and Series B Debentures. It is

---

18. Section § 563b.41(c) was included within 12 C.F.R. Part 563b, Subpart D (1988) (pertaining to "Modified Conversions"), and provided as follows:

(c) The Board delegates to the General Counsel or his designee the authority to approve applications for modified conversions except in those applications presenting a significant issue of law or policy, and to exercise the authority of the Board pursuant to this Section.

19. One of the conditions to Mr. Fleck's approval was that American Federal's "Application for Approval to Issue Subordinated Debt Securities, filed pursuant to Section 563.8–1 of the Insurance Regulations, must be approved prior to consummation of the conversion transaction." DX 534 at PAF081 1623 L.

anticipated that approximately $22.0 million in GAAP net worth and $35.6 million in RAP capital will be initially infused into the association as a result of the conversion. This infusion will allow the association to satisfy its regulatory capital requirement and recognize GAAP net worth representing three percent of total liabilities.

DX 520 at OAF001 2883.

Notwithstanding this evidence, the government asserts that "the approval of the conversion neither addresses nor mentions whether the sub-debt would count toward Am[erican] Fed[eral]'s capital requirements." Def.'s Resp. at 19. This observation, while literally true, is misleading and of no significance. ·The actions respecting the Subordinated Debt Application stand on their own footing wholly apart from the approval of the Modified Conversion Application. In the conditional approval dated December 23, 1988, of American Federal's Subordinated Debt Application, Robert E. Showfety, Principal Supervisory Agent of FHLB–Atlanta, expressly approved the pertinent term of American Federal's offer. Specifically, Mr. Showfety stated: "Pursuant to Section 563.8–1 of the Insurance Regulations, American Federal's application to include as regulatory capital $0.1 million from its issuance of Series A Subordinated Debentures and $13.5 million from its issuance of Series B Subordinated Debentures is hereby approved, subject to the following conditions." DX 545 at OAF001 2750. Moreover, this precise language is additionally reflected in a further ᵔ ꞏ ꞏl memorandum Ms. Scheurenbrand h ᵔnt to Mr. Showfety on December 20, ᵔ ᵔn which she recommended approval. Ɪ · ᵔeurenbrand wrote:

᙮ ᵔ ᵔant to the provisions of Section ᵢ ᵔ ᵔ. -1 of the Insurance Regulations, the s· ' ᵔct institution has applied for approval t ᵔclude in its regulatory capital $0.1 ᵢ ᵔn of Series A Subordinated Deben-

tures and approximately $13.5 million in Series B Subordinated Debentures.

. . .

In connection with the modified conversion, the institution intends to issue, and include in its regulatory capital, $22.0 million of equity and $13.6 million of debt, resulting in GAAP net worth of approximately 3.0 percent and regulatory capital of approximately 5.8 percent of total liabilities.

DX 544 at OAF001 0073.[20]

In sum, these conditional approvals and internal memoranda strongly and explicitly evince the "something more," which requires that "the offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly." *La Van*, 382 F.3d at 1347, 2004 WL 1949853 at *5 (quoting *Estate of Bogley*, 514 F.2d at 1032).

### 2. *Consideration.*

Consideration exists for the government's approval of American Federal's Subordinated Debt Application on the same grounds found by the court to be applicable to consideration for the substituted contract entered respecting goodwill in connection with the government's approval of American Federal's Modified Conversion Application. *See supra*, at 202. In particular, Ms. Scheurenbrand represented to Mr. Showfety that "the approval of this Application [to Issue Subordinated Debt Securities] and the subsequent modified conversion are in the best interests of both the institution and the FSLIC, as the proposed plan of modified conversion will allow the institution to meet its regulatory capital requirement." DX 544 at OAF001 0077–78.

### 3. *Authority to bind the government.*

Finally, Mr. Showfety, as the Principal Supervisory Agent, had authority to bind the

---

**20.** ᵢ. Scheurenbrand's memorandum further ᵋ ᵢned:

᙮ s anticipated that approximately $22.0 mil-
' ᵗ in GAAP net worth and $35.6 million in
P capital will be initially infused into the
titution as a result of the conversion. As a
ᵣult, the institution will have GAAP net worth

totaling $31.0 million (3.0 percent of total liabilities) and RAP capital of $59.6 million, which represents 5.76 percent of total liabilities and exceeds the institution's current regulatory capital requirement by approximately $28.7 million.

DX 544 at OAF001 0075.

government when he approved American Federal's Subordinated Debt Application. The regulations governing issuance of subordinated debt securities at the time vested in the PSA authority to approve such applications. 12 C.F.R. § 563.8–1(i)(1) (1988).[21]

### D. Breach Of Contract

■ Given its findings that contracts regarding goodwill were formed in connection with the merger applications approved in 1982 and that a superseding contract was entered in connection with an approval for a modified conversion in 1988, the court consequently finds that the government breached the substituted contract upon the enactment of FIRREA in August 1989 and at the effective date for implementing regulations in December 1989. *See American Fed.*, 58 Fed.Cl. at 445–46. Similarly, given the court's finding that a contract was entered in 1988 for recognition of newly issued subordinated debt as regulatory capital, that contract was also breached by the government with the enactment of FIRREA and adoption of implementing regulations. *See Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1352 (Fed.Cir.2001); *Home Sav. of America, FSB v. United States*, 57 Fed.Cl. 694, 701 (2003). As the plurality in the Supreme Court's decision in *Winstar III* determined, "[w]hen the law as to capital requirements changed ... the Government was unable to perform its promise and, therefore, became liable for breach." 518 U.S. at 870, 116 S.Ct. 2432. Here too, the government is liable for breach of the substituted contract it had with American Federal regarding goodwill as well as the contract regarding treatment of subordinated debt as regulatory capital.

### CONCLUSION

As explained, the evidence at trial proved that American Federal entered into four contracts with the Bank Board and FHLB–Atlanta for purchase accounting, amortization of resulting goodwill over an explicit forty-year period, and inclusion of unamortized goodwill in its regulatory capital, all in connection with otherwise unassisted merger applications approved during a thirty-seven day period in April and May 1982. Those contracts were modified and superseded by a substituted contract for goodwill accounting entered as part of an approval by the Bank Board's delegatee, Mr. Fleck, in December 1988 for American Federal to carry out a modified conversion to a stock company. The substituted contract displaced and superseded the initial contracts for goodwill, and that contract was breached by enactment of FIRREA. Similarly, American Federal has established that it entered into a contract with the Bank Board for recognition of subordinated debt as regulatory capital. This further contract grew out of its application for approval of an issuance of subordinated debt, which proceeded as part of the modified conversion. That contract was also breached by enactment of FIRREA. Thus, American Federal has established the government's liability for breach of contract in this case.

Preparatory steps for a trial on damages shall be undertaken. In accord with RCFC Appendix A, ¶¶ 11 and 12, the parties are directed to file a joint status report by November 1, 2004, addressing the items in ¶ 12 (last sentence) with respect to trial on damages. That report should address any supplemental discovery that the parties propose be conducted to complete a foundation for trial on damages.

IT IS SO ORDERED.

---

**21.** That regulatory provision provided as follows: The Principal Supervisory Agent is authorized to approve subordinated debt applications filed pursuant to this section, if they are in compliance with regulatory requirements, unless the subordinated debt application involves a significant issue of law or policy upon which the Corporation has not taken a formal position or requires an offering circular for subordinated debt securities to be sold in a public offering. 12 C.F.R. § 563.8–1(i)(1) (1988).